**Buddy CRAMER, Plaintiff–Appellant,**

**v.**

**Samuel K. SKINNER, as Secretary of Transportation, et al., Defendants–Appellees,**

**and**

**Safe Airspace for Everyone, et al., Intervening Defendants, Appellees.**

No. 90–1303.

United States Court of Appeals, Fifth Circuit.

May 9, 1991.

David J. Gallo, Dallas, Tex., for plaintiff-appellant.

Brownell K. Boothe, America West Airlines, Inc., Phoenix, Ariz., for amicus curiae—America West Airlines, Inc.

Phillip Brady, Thomas L. Ray, U.S. Dept. of Transp., Office of General Counsel, Washington, D.C., Myrna B. Silen, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for Skinner, et al.

Leslie T. Thornton, Abbe David Lowell, Brand & Lowell, Washington, D.C., for S.A.F.E., et al.

Before GOLDBERG, KING, and DUHÉ, Circuit Judges.

KING, Circuit Judge:

The plaintiff-appellant Buddy Cramer (Cramer) asserts that the International Air Transportation Competition Act of 1979, Pub.L. No. 96–192, § 29, 94 Stat. 35 (1980) (Love Field amendment), which restricts interstate air service from Love Field Airport (Love Field) in Dallas, Texas, abridges his constitutional rights of free speech and interstate travel. The defendants in this case, the individuals and agencies charged with enforcing the Love Field amendment (the Government), moved the district court for dismissal or, in the alternative, for summary judgment. They alleged that Cramer lacks standing to attack the statute, or that if Cramer has standing, he cannot succeed on the merits. Cramer opposed the Government's motion and filed a cross-motion for summary judgment. The district court granted the Government's motion and entered a take-nothing judgment against Cramer. The district court agreed with the Government that Cramer lacks standing to challenge the Love Field amendment. Because the district court found that the case did not present a justiciable case or controversy, it did not reach the merits of Cramer's claims. We find that Cramer has standing to challenge the Love Field amendment and vacate the district court's judgment based on Cramer's found lack of standing (which must necessarily have been without prejudice). Cramer, however, also appeals from the district court's denial of his cross-motion for summary judgment. We affirm the district court's denial of Cramer's cross-motion for summary judgment on the merits.[1]

---

1. The Government moved the district court to dismiss Cramer's suit, or in the alternative, for summary judgment. The district court did not specify whether it granted the Government's motion to dismiss under Fed.R.Civ.P. 12(b), or if it granted summary judgment under Fed.R.

## I. BACKGROUND AND PROCEDURE

Dallas, Texas and Fort Worth, Texas fought long and bitterly over which city should have the principal airport for the two-city metropolitan area. *See City of Dallas, Texas v. Southwest Airlines Co.,* 371 F.Supp. 1015, 1019 (N.D.Tex.1973) (rejecting request by cities and regional airport board for declaratory judgment stating that they could exclude Southwest Airlines from operating from Love Field), *aff'd,* 494 F.2d 773, *cert. denied,* 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974). Love Field, built by Dallas, competed with Fort Worth's airports. As the district court in *City of Dallas* found, this rivalry "resulted in unnecessary expense to the carriers as well as the taxpayers and inadequate and incomplete air service to both cities." *Id.* at 1020. In the late 1960s, the two cities settled their dispute by building Dallas–Fort Worth International Airport (DFW). As part of that compromise, the eight airlines then serving the area agreed to move to DFW.

Southwest Airlines (Southwest), which began providing intrastate flights from Love Field in 1971, refused to move to DFW, however, and obtained a judgment that it could not be excluded from using Love Field as long as Love Field remained open. *Id.* For several years thereafter, Southwest operated flights from Love Field to locations within Texas. Because it operated from Love Field only intrastate, Southwest was exempt from the regulations that governed interstate airline operations under the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.* When Congress deregulated the airlines, however, Southwest obtained authority from the Civil Aeronautics Board (CAB) to operate flights from Love Field to New Orleans. In so doing, CAB rejected the argument of Dallas and Fort Worth and the Dallas–Fort Worth Regional Airport Board that the Airline Deregulation Act of 1978 (Deregulation Act), Pub.L. No. 95–504, 92 Stat. 1705, included a provision specifically intended to bar CAB from authorizing interstate air service at such an airport over the objections of the local airport proprietor.

Congress reacted to CAB's decision by adopting the Love Field amendment as part of legislation further deregulating the airline industry. *See* International Air Transportation Competition Act of 1979, § 29, Pub.L. No. 96–192, 94 Stat. 35, 48–49 (1980). In essence, the Love Field amendment, which applies only to Love Field, prohibits airlines from offering single ticket interstate service from Love Field except to the four states contiguous to Texas (the Love Field service area).

Although this amendment restricts airline services at Love Field, a traveler can obtain unrestricted airline services at DFW, located 18 miles from the center of Dallas and only 12 miles from Love Field. Travelers also can use Love Field to reach points outside the Love Field service area by taking a second flight. Such travelers must buy a separate ticket for each leg of the trip, however, and cannot check their baggage for the entire journey. The Love Field amendment also prohibits airlines from advertising or volunteering information on service outside the Love Field service area. It does not prohibit an airline, however, from providing such information on request. Southwest continues to provide interstate service at Love Field subject to these statutory restrictions. No other carrier now operates flights to Love Field with large aircraft, although three carriers made attempts.[2]

Civ.P. 56. Because the district court may have considered matters outside the pleadings in making its jurisdictional determination, it arguably considered the standing issue on the Government's motion for summary judgment. Even if the district court considered the standing issue on the Government's motion for summary judgment, however, it considered only the jurisdictional question and not the merits of Cramer's claims.

2. Texas International Airlines made the first such attempt. It began operating interstate service from Love Field in 1980, but subsequently terminated that service. Muse Air next attempted to compete with Southwest at Love Field, but its operations were financially unsuccessful. Southwest later acquired Muse Air and terminated its operations. Finally, Continental Airlines in 1985 announced plans to begin airline

On April 21, 1989, Cramer filed suit in federal district court, alleging that the Love Field amendment violates his rights to free speech and interstate travel. Cramer's second amended complaint sought a judgment declaring the statute unconstitutional, enjoining the defendants from enforcing the statute, and awarding him $100 as compensatory or nominal damages. The defendants are the United States of America, Samuel K. Skinner in his capacity as Secretary of Transportation, the United States Department of Transportation (DOT), John V. Coleman in his capacity as Director of DOT's Office of Aviation Analysis, and the Office of Aviation Analysis. The individual defendants in their official capacity, DOT, and DOT's Office of Aviation Analysis enforce the Love Field amendment.

On June 20, 1989, the Government filed a motion to dismiss the complaint for lack of standing or, in the alternative, for summary judgment. On July 7, 1989, Cramer filed a cross-motion for summary judgment. On April 11, 1990, the district court entered a memorandum order dismissing the complaint because Cramer failed to demonstrate standing to challenge the Love Field amendment. The court held that the Love Field amendment's restrictions on advertising had not injured Cramer because he could obtain information on service beyond the Love Field service area on request. The district court did not question that Cramer's right to interstate travel had been injured, but reasoned that Cramer failed to show that a favorable judgment was likely to redress that injury. Because the district court dismissed Cramer's complaint for lack of standing, it did not rule on the constitutional issues presented by the cross-motions for summary judgment. Cramer filed a timely notice of appeal.

## II. ANALYSIS

### A. Standing

#### 1. Standard of review

■ "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian College v. Americans for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The Supreme Court has inferred from the case or controversy requirement that a litigant must have "standing" to maintain an action in federal court. In order for a litigant to establish standing, article III, at a minimum, requires the litigant to show:

[1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ...

[2] that the injury "fairly can be traced to the challenged action" and

[3] [that the injury] "is likely to be redressed by a favorable decision."

*Id.* at 472, 102 S.Ct. at 758 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In addition, the Supreme Court has stated that a court should consider three prudential concerns in determining standing. *See Valley Forge Christian College*, 454 U.S. at 471, 102 S.Ct. at 757; *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979). Those considerations are:

1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue;

2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and

3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir.1987) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315,

operations at Love Field but never began such service.

3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College*, 454 U.S. at 474–75, 102 S.Ct. at 759–60; *Gladstone, Realtors*, 441 U.S. at 100, 99 S.Ct. at 1608).

 Different standards apply when a litigant challenges standing on a Fed.R. Civ.P. 12(b) motion than on a motion for summary judgment under Fed.R.Civ.P. 56. When a court considers standing on a motion for a Rule 12(b) dismissal, it must accept the allegations in the pleadings as true. *Lujan v. National Wildlife Fed'n*, —— U.S. ——, 110 S.Ct. 3177, 3184, 111 L.Ed.2d 695 (1990). When the defendant moves for summary judgment because of lack of standing, however, the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue. *Id.* Cramer contends that the district court considered the standing issue on the Government's motion for dismissal under Rule 12(b) and that we should accept the allegations contained in his complaint as true even if not supported by admissible summary judgment evidence. The Government, on the other hand, contends that we should apply the summary judgment standard and consider only Cramer's admissible summary judgment evidence. The record is unclear on whether the district court granted the Government's motion based on Rule 12(b) or Rule 56. Even if we apply the summary judgment standard and consider only Cramer's admissible summary judgment evidence, however, we conclude that Cramer established standing.[3]

Cramer asserts three discrete injuries: (1) deprivation of his first amendment right to hear, (2) deprivation of his right of interstate travel, and (3) economic injury. Because an adjudication of the question of standing is not an adjudication on the merits, we must assume that the conduct of which Cramer complains is unconstitutional. *Warth*, 422 U.S. at 502, 95 S.Ct. at 2207 ("We also assume, for [standing] purposes ... that such ... practices, if proved in a proper case, would be adjudged violative of the constitutional ... rights of the persons [affected].").

## 2. Right to hear

 The Love Field amendment prohibits an airline from "offer[ing] for sale"

---

**3.** Although the language in the Government's motion is not entirely clear, the Government appears to ask the district court for a Rule 12(b) dismissal on the basis of standing and for summary judgment on the merits in the alternative. The Government moved the court to dismiss this case or, in the alternative, for summary judgment in their favor, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants move the Court to dismiss the case for lack of jurisdiction, since there is no case or controversy as required by the Constitution.... If the court does not dismiss the complaint, the defendants will be entitled to a judgment against plaintiff as a matter of law, as there is no issue of material fact.

The district court and both parties to this suit, however, treated the standing issue as before the court on a motion for summary judgment. In its memorandum order, the district court stated that the action was "before it on cross-motions for summary judgment" and concluded that because "Cramer has no standing to challenge the constitutionality of the Love Field amendment, the United States' motion to dismiss or for summary judgment is granted, while Cramer's motion for summary judgment must be denied." The Government also treated the standing issue as before the district court on a motion for summary judgment. In connection with its motion, the Government submitted a statement of material facts as to which no genuine issues existed, and a statement of issues of law. Such a statement is pertinent only to a motion for summary judgment. Many of the facts in the Government's statement, and the first issue of law, concerned Cramer's standing. *See Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 192–95 (5th Cir.1988) (finding that district court dismissed based on summary judgment motion rather than Rule 12(b) because district court considered defendant's statement of undisputed facts).

Furthermore, Cramer submitted affidavits to the district court that were relevant both to the merits of his claims and to the standing issue, and the district court did not exclude these affidavits. In fact, in making its standing determination, the district court considered a letter from America West Airlines, attested to by an affidavit by Cramer's attorney, that stated that America West would consider service to Love Field if the Love Field amendment were declared unconstitutional. The district court's admission and consideration of this evidence is significant because Rule 12(c) states that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...."

transportation to points outside the Love Field service area. As interpreted by DOT, this prohibition applies not only to airlines but also to travel agents who act as agents for airlines. Cramer asserts that the Love Field amendment's prohibition against air carriers and travel agents volunteering information concerning travel beyond the Love Field service area violates his first amendment right to hear. The district court held that, because "Cramer knows that he is entitled to such information upon request, he is not being denied any information he would receive if the Love Field amendment were held unconstitutional." The district court did not address, and the Government does not argue, whether Cramer's asserted injury to his first amendment right to hear is fairly traceable to the Love Field amendment, or whether invalidation of the Love Field amendment would redress his asserted injury.

Cramer argues that the district court's holding conflicts with the Supreme Court's decision in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In *Virginia State Bd. of Pharmacy*, the Court reasoned that "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted [by would-be listeners]." *Id.* at 757, 96 S.Ct. at 1823. The Court reasoned:

> We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent right of the listener to receive the information sought to be communicated.

*Id.* at 757 n. 15, 96 S.Ct. at 1823 n. 15.

The Government argues that the passage quoted above states only that would-be listeners have a first amendment right to receive commercial speech and that they may assert that right despite their ability to receive the information by asking. It does not relieve the plaintiff, the Government argues, from the necessity of demonstrating that he has suffered some actual or threatened injury because of the defendant's conduct. *See Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758. In effect, the Government argues that only individuals who do not know that they can request information can show an injury to their right to hear commercial speech because would-be listeners who know to ask for the information have not been injured. We disagree.

■ The Supreme Court has described the injury requirement for standing as an "injury in fact" that is "distinct and palpable," and not "abstract," "conjectural," or "hypothetical." *See Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. If an individual's statutory or constitutional rights have been violated, and that right is cognizable by the courts, he has suffered an injury. That injury is insufficient to establish standing, however, if it is a generalized grievance common to all members of the public or if the injury is merely abstract. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216–27, 94 S.Ct. 2925, 2929–30, 41 L.Ed.2d 706 (1974) (no standing as taxpayers to challenge whether members of Congress could hold commissions in the Armed Forces Reserve under the incompatibility clause of article I); *United States v. Richardson*, 418 U.S. 166, 175, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974) (plaintiff did not have standing as taxpayer to argue that legislation that permitted the CIA to withhold from the public detailed information about its expenditures violated the accounts clause of the Constitution because "his challenge was not addressed to the taxing or spending power, but to the statutes regulating the CIA."). These requirements of an actual injury tend "to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758. In order to demonstrate standing, a plaintiff must allege both a constitutional violation and an identifiable personal injury resulting from that violation. *Id.* at 485, 102 S.Ct. at 765.

Cramer's first amendment claim meets this standard. Although Cramer does not allege a large or intense personal injury, it is not merely an "'abstract injury in nonobservance of the Constitution asserted by ... citizens.'" *Valley Forge Christian College*, 454 U.S. at 482, 102 S.Ct. at 764 (quoting *Schlesinger*, 418 U.S. at 223 n. 13, 94 S.Ct. at 2933 n. 13). In his affidavit, Cramer states that he travels frequently to states beyond the Love Field service area on regularly scheduled passenger flights. He states that he depends to some extent on airline personnel, travel agents, or publications printed by the airlines to plan his trips. The Love Field amendment, he contends, makes planning his trips more difficult. The Government does not dispute these assertions.

The personal inconvenience that Cramer suffers in planning his trips because of the Love Field amendment may be slight, but it is nonetheless real and nonetheless an injury. The Constitution draws no distinction between injuries that are large, and those that are comparatively small. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686–87, 689 n. 14, 93 S.Ct. 2405, 2415–16, 2417 n. 14, 37 L.Ed.2d 254 (1973) ("identifiable trifle" is sufficient injury to establish standing; standing is not "to be denied simply because many people suffer the same injury") (quoting Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L. Rev. 601, 613); *Saladin*, 812 F.2d at 691 ("There is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be."); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C.Cir.1986) (injury "will not suffice if it is too speculative, but it need not be large or intense") (citation omitted).

■ The critical question for standing is not the extent of the plaintiff's injury, but whether the plaintiff has alleged "such a personal stake in the outcome of the con-

troversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions?" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The injury in fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *SCRAP*, 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14 (1973). Cramer has such a direct stake.

Our resolution of the standing issue might be different if Cramer had not suffered personally the inconveniences associated with the Love Field amendment's restrictions on commercial speech. His injury, in that case, might well be speculative and hypothetical. Cramer, however, has more than an abstract interest in seeing that the Government observes the Constitution—he is affected by the Love Field amendment's restrictions on speech whenever he plans a trip beyond the Love Field service area. The injury that Cramer asserts places his first amendment issue in a "concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758. Furthermore, we believe that the Supreme Court meant what it said when it stated that the right to receive advertising may be asserted by a would-be listener even though the listener could obtain the information simply by asking. *Virginia State Bd. of Pharmacy*, 425 U.S. at 757, 96 S.Ct. at 1823. We conclude, therefore, that Cramer has alleged a sufficient injury to have standing to assert his first amendment claim.[4]

3. Whether Cramer's injuries are likely to be redressed by a favorable decision of the court

The district court did not hold that Cramer failed to demonstrate an injury to his

---

4. We also note that the Government's argument appears to put the burden on the wrong shoulders. If the statute is, in fact, unconstitutional, Cramer ought not to have to ask for the information he seeks. Furthermore, the existence of

the Love Field amendment may have a chilling effect on the willingness of travel agents to impart information even at Cramer's request, thus impairing his ability to exercise his right to hear.

right to interstate travel, or that any of his asserted injuries were not fairly attributable to the Government's putatively illegal conduct. Rather, it held that Cramer failed to demonstrate that a favorable ruling by the court would redress his alleged injury to his right to interstate travel.[5]

The Supreme Court has articulated the redressability component for standing in various ways. In *Valley Forge Christian College,* the Court inquired whether the asserted injury was " 'likely to be redressed by a favorable decision.' " 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon,* 426 U.S. at 38, 96 S.Ct. at 1924). In *Allen,* the Supreme Court inquired if "the prospect of obtaining relief from the injury as a result of a favorable ruling [was] too speculative?" 468 U.S. at 752, 104 S.Ct. at 3325. And in *Warth,* the Supreme Court stated that the plaintiff "must allege facts from which it reasonably could be inferred that ... there is a substantial probability" that the asserted injury will end "if the court affords the relief requested." 422 U.S. at 504, 95 S.Ct. at 2208. Under any of these formulations of the redressability requirement, the plaintiff need show that only one of his asserted injuries will be redressed by a favorable ruling. *Larson v. Valente,* 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 1682 n. 15, 72 L.Ed.2d 33 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.") (emphasis in original).

Cramer argues that three distinct injuries might be redressed by a favorable ruling: injury to his first amendment rights, injury to his right to interstate travel, and economic injury. Because the district court found that Cramer had not demonstrated an injury in fact to his first amendment rights, it did not address whether that injury might be redressed by a favorable ruling. The district court also did not address whether a favorable ruling would redress Cramer's economic injury. The district court did find, however, that a

favorable ruling would not redress Cramer's injury to his right to interstate travel because Cramer had not shown that an airline was willing to relieve the inconveniences caused by the Love Field amendment if the amendment were found unconstitutional.

Cramer need show that only one of his alleged injuries would be redressed by a favorable ruling, and neither the Government nor the district court has argued that a favorable ruling would not redress Cramer's alleged injury to his first amendment rights. That injury would be redressed if, because of a favorable ruling, an air carrier or travel agent advertised, published, or volunteered information concerning service outside the Love Field service area. Cramer satisfied this requirement by supplying the affidavit of a travel agent stating that she would inform clients concerning connecting flights to locations outside the Love Field service area if the Love Field amendment were invalidated. In fact, in arguing that Cramer's alleged economic injury would not be redressed by a favorable ruling, the Government apparently concedes that a favorable ruling would redress Cramer's alleged first amendment and interstate travel injuries. The Government argues that, although Cramer could not receive damages, "Cramer's [other] alleged injuries ... would be remedied if the court awarded the declaratory and injunctive relief sought by him."

Although we conclude that a favorable ruling would redress the injury to Cramer's first amendment rights, we also conclude that he alleged sufficient facts from which we reasonably can infer that a substantial probability exists that his alleged injury to his right to interstate travel also would be redressed by a decision in his favor. *Warth,* 422 U.S. at 504, 95 S.Ct. at 2208 ("Petitioners must allege facts from which it reasonably could be inferred that ... there is a substantial probability [that the asserted injury would end] if the court affords the relief requested"). Cramer's injury would be redressed if additional

---

**5.** The district court did not consider Cramer's alleged economic injury.

carriers commenced service at Love Field,[6] if Southwest instituted through fares at Love Field, or if Southwest ceased the inconveniences now mandated by the Love Field amendment, such as requiring passengers to depart from a flight continuing beyond the Love Field service area to the passenger's ultimate destination.

One can reasonably infer that Southwest would sell through tickets to areas outside the Love Field service area were it permitted to do so, just as it does at its other locations. The Government observes that Southwest is the only carrier at Love Field and argues that for this reason Southwest might not wish to offer the lower priced through fares. The Government overlooks, however, that Southwest currently competes with airlines offering service from DFW, just twelve miles away.

Cramer also argues that one can infer from Southwest's consistent practice at other locations that it would not continue to inconvenience passengers from Love Field were it not constrained to do so. At the least, Cramer argues, Southwest would not continue to require a passenger to depart from a flight continuing to the passenger's final destination, require the passenger to collect luggage, buy another ticket, and wait at least forty-five minutes before continuing on another flight. The Government argues that such a conclusion is mere speculation. We find such an inference reasonable, however, based on Southwest's self-interest, consistent practice, and common sense.

We conclude that Cramer satisfied the redressability requirement for standing by offering sufficient evidence from which we reasonably can infer the substantial probability that at least one of his alleged injuries would be redressed by a favorable decision. Because the district court did not address, and the Government does not argue, that Cramer's alleged injuries are not fairly traceable to the illegal conduct, we conclude that Cramer has standing to challenge the Love Field amendment.

### B. Merits

Because we find that Cramer has standing to challenge the Love Field amendment, and because the parties have fully briefed the merits of this dispute (which does not present any contested issues of material fact), we consider Cramer's appeal from the district court's denial of his cross-motion for summary judgment. Cramer argues that he was entitled to summary judgment because the Love Field amendment abridges his first amendment and interstate travel rights and because the Government has not advanced a governmental interest sufficient to justify these abridgments.

### 1. Restrictions on Cramer's right to interstate travel

Although no clause in the Constitution specifically provides a right to interstate travel, the Supreme Court has inferred this right from various constitutional provisions and from the structure of the federal system itself. In his interstate travel argument, Cramer relies principally upon the due process clause of the fifth amendment, the privileges and immunities clause of article IV,[7] the assembly clause

6. Cramer provided a letter from America West stating that America West was "seriously interested in providing service to Love Field [and] ... would promptly consider the institution of service to and from Love Field" were the statute invalidated. Because America West did not firmly commit to beginning service from Love Field, however, the district court concluded that this letter did not demonstrate the likelihood that America West actually would commence service as a result of a favorable ruling. We do not necessarily agree with the district court's interpretation of this letter. America West hardly could be expected to provide an absolute commitment without knowing when, if ever, the amendment would be invalidated, and without knowing the state of America West's, the nation's, or the Dallas/Fort–Worth area's economy at that time. In these circumstances, America West's statements appear reasonably firm. We also note that America West filed an amicus brief in this court stating that it is "actively interested" in providing service from Love Field and does not currently offer such service because of the Love Field amendment.

7. Cramer appears to confuse the privileges and immunities clause of article IV, however, with the privileges and immunities clause of the fourteenth amendment. The privileges and immunities clause article IV states that "[t]he citizens

of the first amendment, and the port preference clause of article I. Cramer's argument under each of these clauses is essentially the same. He asserts that the Love Field amendment infringes a fundamental right and that the Government has not advanced a compelling interest to justify the infringement.

We do not write on an entirely clean slate in determining whether the Love Field amendment impermissibly infringes on Cramer's right to interstate travel. In *City of Houston v. F.A.A.*, 679 F.2d 1184, 1198 (5th Cir.1982), we upheld similar restrictions placed on the use of Washington's National Airport (National). We rejected in that case a challenge to Federal Aviation Administration regulations that prohibited the use of National for non-stop flights to cities more than 1,000 miles from Washington. Under those regulations, a traveler from a location more than 1,000 miles from Washington must stop or change planes in a city less than 1,000 miles, or take a direct flight to Dulles International Airport (Dulles), or Baltimore–Washington International Airport. National, however, is close to the center of Washington, while Dulles is 26 miles west of downtown. *Id.* at 1186, 1187. The plaintiffs in *City of Houston* argued, *inter alia,* that the perimeter rule at issue in that case infringed upon their right to interstate travel and violated the port preference clause. In rejecting their challenge, we reasoned that

> [a]t most, their argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel. That notion, as any experienced traveler can attest, finds no support....

*Id.* at 1198.[8]

In his attempt to distinguish *City of Houston,* Cramer seizes upon dictum stating that an attempt "completely to bar travelers from distant cities from flying to National Airport ... might well give rise to a constitutional claim." *Id.* at 1192. Cramer argues that the Love Field amendment represents just such an attempt to bar all travelers from outside the Love Field service area from flying to Love Field. We disagree.

The Love Field amendment does not bar travelers from distant cities from using Love Field. Rather, just as the perimeter rule at issue in *City of Houston,* it makes travel less convenient for such passengers. Love Field remains attractive for many long-distance travelers, apparently including Cramer himself, despite the statutory restrictions.

Cramer also argues that the Love Field amendment is fatally different from the perimeter rule at issue in *City of Houston* because Congress chose to define Love Field's permissible service area by using state borders. The use of state borders to define the permissible service area, he argues, penalizes interstate travel as interstate travel—the precise evil the Constitution prohibits. Cramer cites no authority, however, for the proposition that a Congressional statute regulating commerce may not use state boundaries for definitional purposes, nor can we discern any reason Congress should be prohibited from using such borders. Cramer, we note, does not allege that the Government had a discriminatory purpose for using such borders.

---

of each state shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The privileges and immunities clause of article IV merely limits the right of states to exclude citizens of other states from privileges granted to its own citizens. *United States v. Wheeler,* 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270 (1920). While we have held that state legislation may violate the privileges and immunities clause of article IV if it unjustifiably denies the right to travel, that clause applies only to state legislation and does not govern federal statutes. *See e.g., Frazier v. Heebe,* 788 F.2d 1049, 1052 (5th

Cir.1986), *rev'd on other grounds,* 482 U.S. 641, 107 S.Ct. 2607, 96 L.Ed.2d 557 (1987).

**8.** The Second Circuit upheld a similar perimeter rule in *Western Air Lines, Inc. v. Port Authority,* 817 F.2d 222 (2d Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988). The rule at issue in that case also required passengers traveling a long distance to use a less convenient airport. The plaintiff, however, did not argue that the rule violated the constitutional right to travel.

Any geographical limit for air service from Love Field must be somewhat arbitrary, but we reject Cramer's assertion that the use of state borders for definitional purposes violates the Constitution.

In a further attempt to distinguish *City of Houston,* Cramer argues that the Love Field amendment's statutory restrictions, in contrast to the regulations we upheld in *City of Houston,* are irrational because they are unnecessary. He argues that the perimeter rule was needed to protect Dulles because Dulles was underused, but the Love Field amendment is not needed to protect DFW because DFW is a busy airport. We disagree that the Love Field amendment's restrictions are irrational. The Love Field amendment carries out the agreement between Dallas and Fort Worth that ended the competition between those cities for the area's principal airport. The success of DFW illustrates the importance of that agreement. Cramer contends, in effect, that the very success of that agreement, as measured by the traffic at DFW, indicates that the agreement is irrational.[9] We disagree.

■ As we stated in *City of Houston,* travelers do not have a constitutional right to the most convenient form of travel. *Id.* at 1198. Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification. *See Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 903, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 (1986) (a state law only implicates the right to travel when

it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification that serves to penalize the exercise of the right to travel). Cramer remains free to travel unrestricted to points outside the Love Field service area from Dallas by using DFW, or he can take a second flight from a point within the Love Field service area. The amendment does not deter Cramer from travelling by air, and the statute's history shows that its purpose was not to impede travel but to carry out an agreement thought necessary to benefit the region's travelers by consolidating service at DFW. *See* H.R.Rep. No. 96–716, 96th Cong., 1st Sess. 24, U.S.Code Cong. & Admin.News 1980, pp. 54, 86 (purpose of amendment was to provide "a fair and equitable settlement for a dispute that has raged in the Dallas/Fort Worth area for many years"). In addition, unlike a residency requirement, the Love Field amendment does not use any classification that penalizes a person's exercise of his or her right to travel. If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue.[10]

■ In *City of Houston,* we also rejected the argument that the perimeter rule violated the port preference clause. The port preference clause provides:

> No Preference shall be given by any Regulation of Commerce or Revenue to

---

9. Congress may, in the future, elect to respond to changing conditions at Love Field. That case is not before us, and we do not intimate what our response might be to such a Congressional decision.

10. For example, in *Jones v. Helms,* 452 U.S. 412, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981), the Supreme Court upheld a state law that made it a felony if a parent willfully and voluntarily abandons a dependent child and then leaves the state. In rejecting the claim that the statute violates the right to interstate travel, the Supreme Court did not require the state to show a substantial need for the law. The Court reasoned that because the law's restrictions on interstate travel do "not infringe upon appellee's fundamental rights," the state "need not employ

the least restrictive, or even the most effective or wisest, means to achieve its legitimate ends." *Id.* at 425–26, 101 S.Ct. at 2443.

Similarly, in *Niles v. University Interscholastic League,* 715 F.2d 1027 (5th Cir.1983), *cert. denied,* 465 U.S. 1028, 104 S.Ct. 1289, 79 L.Ed.2d 691 (1984), we upheld a school district rule that prevents students from playing on interscholastic athletic teams until the student has been a resident of the district for one year. The student contended that he could not comply with the residency requirement because he had been living with his mother in another state and argued that the rule violated his right to interstate travel. In rejecting his argument, we reasoned that the rule was not a significant infringement on the student's right to travel. *Id.* at 1030–31.

Ports of one State over those of another; nor shall Vessels bound to, or from, one State be obliged to enter, clear, or pay duties in another.

U.S. Const. art. I, § 9, cl. 6. Cramer contends that the Love Field amendment violates the port preference clause because it requires vessels bound from Love Field to enter and pay duties to one of the four states contiguous to Texas before continuing.[11] The Love Field amendment, Cramer argues, results in a detriment to Love Field, a port of Texas, and to the ports of those states not accessible from Love Field.

We stated in *City of Houston* that a statute that results in some detriment to the port of a state does not violate the port preference clause when the detriment occurs "(i) as an incident to some otherwise legitimate government act regulating commerce or (ii) more as a result of the accident of geography than from an intentional government preference."[12] *City of Houston,* 679 F.2d at 1197. The Love Field amendment satisfies both tests.

Cramer, however, argues that the Love Field amendment's detriment to Love Field is not incident to a legitimate Government act because Congress' sole purpose in enacting the amendment was to restrict interstate travel. We disagree. Congress did not decide to cut back service at Love Field, as Cramer assumes, for no reason. Congress enacted the Love Field amendment incident to its legitimate regulation of interstate airline service and pursuant to its rational decision to maintain the agreement between Dallas and Fort Worth.[13] Furthermore, although Congress used state borders to define the area of unrestricted service, the four states allegedly preferred by the amendment benefit "as a result of an accident of geography." Cramer, in fact, does not suggest that Congress chose those borders for any reason except that they happened to be the states closest to Dallas and Fort Worth.[14]

Cramer also argues that the Love Field amendment violates the assembly clause of the first amendment.[15] He discusses the "freedom riders" of the desegregation movement, and the 1964 march on Washington. He argues that approval of the Love Field amendment could open the door at some future date to a facially neutral statute whose actual purpose is to suppress dissent by inhibiting interstate travel. The Love Field amendment's restraints on interstate travel, he contends, should be considered analogous to restraints on speech; and because the Love Field amendment uses state borders to define the service area, we should treat the Love Field amendment's restrictions on travel as analogous to regulations on the content of

---

**11.** Cramer notes that passenger aircraft are required to pay landing fees when landing at most airports. He argues that because some of the airports in contiguous states undoubtedly are owned by those states, aircraft are required, in essence, to pay duties to those states.

**12.** In articulating this rule, we relied upon a line of Supreme Court cases interpreting the port preference clause. In *South Carolina v. Georgia,* 93 U.S. 4, 13, 23 L.Ed. 782 (1876), the Supreme Court held that "the prohibition of such a preference does not extend to acts which may directly benefit the ports of one State and only incidentally injuriously affect those of another." Similarly, in *Alabama Great Southern R.R. Co. v. United States,* 340 U.S. 216, 229, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951), the Supreme Court upheld an Interstate Commerce Commission order that allegedly gave a preference to a New Orleans port over ports in other states on the ground that "whatever preference there is to New Orleans is a result of geography and not of any action of the Commission."

**13.** The Conference Committee stated that the Love Field amendment "provides a fair and equitable settlement for a dispute that has raged in the Dallas/Fort Worth area for many years" and has been agreed to by "Southwest Airlines, the City of Dallas, the City of Fort Worth, DFW Airport authority, and related constituent groups." H.R.Rep. No. 96–716, 96th Cong. 1st Sess. 24 (1979), U.S.Code Cong. & Admin.News 1980, p. 86.

**14.** The purpose of the Port Preference Clause, as we stated in *City of Houston,* is to give "small states protection against deliberate discrimination against them by other, more powerful states." *Id.* at 1198. Cramer has not demonstrated that Congress deliberately discriminated against the 45 states not bordering on Texas by requiring travelers from such states to use DFW if they wish to travel to Dallas–Fort Worth on a non-stop or "through" ticket.

**15.** Cramer, however, cites no precedent for this proposition.

speech. Such a regulation, he contends, should be upheld only if the Government asserts a compelling justification. Although a facially neutral restriction on travel intended to inhibit first amendment rights is not beyond the realm of possibility, Cramer does not contend that he has a political motive for his travel or that Congress had an ulterior motive in enacting the Love Field amendment. In these circumstances, Cramer cannot rely on any incidental effects such a restriction may have on his right to free association.

### 2. First Amendment

■■■ Cramer contends that the Love Field amendment's restrictions on speech infringe his first amendment right to receive lawful, truthful commercial information. *See Virginia State Bd. of Pharmacy*, 425 U.S. at 748, 96 S.Ct. at 1819. To evaluate this argument, we first must determine whether the speech at issue is commercial. If so, we must ascertain if it receives first amendment protection. Finally, if the first amendment protects the speech, we must decide if the Love Field amendment's restrictions violate the first amendment.

■■■ "Commercial speech" is speech whose purpose is to "propose a commercial transaction." *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (1989). Classification of the speech as commercial does not become inappropriate merely because the speech is mixed with pure speech or touches on matters of public concern. *Id.* The Love Field amendment states that airlines may not offer service from Love Field to points outside the Love Field service area. DOT's interpretation of that provision allows carriers to provide information and sell transportation to points outside the Love Field service area

on request from a traveler, but forbids airlines (and travel agents) from advertising or offering to sell such transportation to travelers who do not request it. DOT Order 85–12–81. The purpose of offering or advertising service to points outside the Love Field service area is to propose a commercial transaction. The speech at issue, therefore, meets the Supreme Court's definition of "commercial speech."

■■■ Commercial speech receives the protection of the first amendment when it "concern[s] lawful activity and [is] not ... misleading." *Id.*, 109 S.Ct. at 3032 (quoting *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980)).[16] The sale of airline tickets is lawful, and the Love Field amendment restricts airlines and travel agents from offering truthful information concerning connecting flights to areas outside the Love Field service area. The speech at issue in this case, we conclude, is truthful and concerns a lawful activity and therefore receives first amendment protection.

■■■ The Supreme Court articulated the test for determining whether restrictions on commercial speech violate the first amendment in *Central Hudson*. *Id.* at 566, 100 S.Ct. at 2351; *see also Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986). Commercial speech may be "restricted only if the government's interest in doing so is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than necessary to serve that interest."[17] *Posadas*, 478 U.S. at 340, 106 S.Ct. at 2976 (citing *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351).

**16.** Cramer argues that commercial speech that proposes a transaction that would facilitate the exercise of the right to interstate travel, or any fundamental right, should be afforded protection equivalent to that afforded non-commercial speech. Even assuming that this argument is correct, it is unavailing in these circumstances because we have concluded that the Love Field

amendment does not violate Cramer's right to interstate travel.

**17.** The Supreme Court has upheld substantial restrictions on commercial speech under this standard. *See e.g., Posadas*, 478 U.S. 328, 106 S.Ct. 2968 (upholding prohibition on advertising gambling casinos to Puerto Rico residents).

Under the *Central Hudson* test, we first must determine if the Government has a substantial interest in restricting information concerning travel from Love Field to locations outside the Love Field service area. Cramer contends that the Government has not asserted a substantial interest. We disagree. The purpose of the Love Field amendment, as stated in the Conference Committee report, was to provide "a fair and equitable settlement for a dispute that has raged in the Dallas/Fort Worth area for many years" and has been agreed to by "Southwest Airlines, the City of Dallas, the City of Fort Worth, DFW Airport authority, and related constituent groups." H.R.Rep. No. 96–716, 96th Cong. 1st Sess. 24 (1979), U.S.Code Cong. & Admin.News 1980, p. 86. We conclude that Congress had a substantial interest in resolving the dispute between Dallas and Fort Worth, a controversy that had long hindered efforts to improve airline service for the Dallas–Fort Worth area. *See City Of Dallas*, 371 F.Supp. at 1020.[18]

We next must determine whether the Love Field amendment's restrictions on commercial speech directly advance the Government's interest in providing a "fair and equitable settlement" for the dispute between Dallas and Fort Worth. Dallas and Fort Worth agreed that DFW should be the principal airport for the two-city metropolitan area. The Love Field amendment's restrictions on advertising directly advance that interest by encouraging the use of DFW rather than Love Field. It encourages the use of DFW because some travelers may not realize that service beyond the Love Field service area is available from Love Field and by making travel beyond the Love Field service area from Love Field somewhat more difficult even for travelers who realize that such information is available upon request.[19]

The challenged statute also satisfies the last prong of the *Central Hudson* test because the restrictions on commercial speech are no more extensive than necessary to serve the Government's interest. The critical question, as clarified by the Supreme Court's opinion in *Board of Trustees*, is whether a reasonable fit exists between the challenged advertising restrictions and the Government's asserted interest. *Board of Trustees*, 492 U.S. at 473–77, 109 S.Ct. at 3032–35. The Love Field amendment's limitation on advertising reduces the demand for service to points outside the Love Field service area and thus helps to preserve the agreement between Dallas and Fort Worth. Without the ban on advertising, more intrusive restrictions might be necessary to carry out Congress' decision to keep service at Love Field from undermining the agreement between Dal-

---

**18.** We note that the intervenors in this case argue that the Love Field amendment is a legitimate health and safety regulation. They contend, *inter alia,* that the current regulations work to prevent or minimize engine parts from literally falling from the skies, from creating a class of virtual noise refugees, and from worsening the already serious asthmatic conditions of residents.

**19.** In *Virginia State Bd. of Pharmacy,* the Supreme Court rejected the argument that restrictions on providing information concerning drug prices was supported by a substantial Government interest in promoting high professional standards among pharmacists. *Virginia State Bd. of Pharmacy,* 425 U.S. at 768, 96 S.Ct. at 1829. The Court reasoned that the Board's argument was greatly undermined "by the close regulation to which pharmacists in Virginia are subject," and because the Board's justifications were based on a paternalistic desire to protect the public. *Id.* The Government's interest in enacting the Love Field amendment, however, does not suffer from these infirmities. Although the airline industry is highly regulated,

Congress enacted the Love Field amendment to discourage the use of Love Field for long-distance flights and not to promote professional standards in the airline industry or in a paternalistic attempt to protect the public by denying it information.

The most significant distinction between *Virginia State Bd. of Pharmacy,* however, and the instant case is that the regulations at issue in *Virginia State Bd. of Pharmacy* did not directly advance the Government's asserted interest. The Board's asserted goals of promoting professionalism among pharmacists and improving the public's health in the *Virginia State Bd. of Pharmacy* could be accomplished as well by informing the public fully so that they could make their own informed choice as to the drugs they wished to purchase. The Government's purpose in enacting the Love Field amendment (implementing the agreement between Dallas and Fort Worth by reducing interstate travel from Love Field) could not be accomplished as easily without the restrictions on advertising.

las and Fort Worth. We conclude, therefore, that the Love Field amendment satisfies each prong of the *Central Hudson* test and does not amount to a constitutionally impermissible infringement on Cramer's right to receive lawful, truthful commercial speech. The district court did not err, therefore, by not granting Cramer's cross-motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, we conclude that the district court erred by dismissing Cramer's suit for lack of standing, but properly denied Cramer's cross-motion for summary judgment. Although the Government has fully briefed the merits of its motion for summary judgment, we cannot order judgment on the merits for the Government because the Government did not cross-appeal from the district court's jurisdictional dismissal. *United States v. American Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924) (party who does not cross-appeal may not seek to enlarge his own rights or lessen those of his adversary); *Ayers v. United States*, 750 F.2d 449 (5th Cir.1985). We therefore vacate and remand with instructions to the district court to consider the Government's motion for summary judgment and for further proceedings consistent with this opinion. Costs shall be borne by Cramer.

VACATED AND REMANDED.