LEGEND AIRLINES, INC.; City of Dallas, Texas; Continental Airlines, Inc.; and Continental Express, Inc., Appellants,

v.

CITY OF FORT WORTH, Texas and American Airlines, Inc., Appellees.

No. 2–99–098–CV.

Court of Appeals of Texas, Fort Worth.

May 25, 2000.

Jenkens & Gilchrist, Paul C. Walter, Robert B. Gilbreath, Joseph C. Edwards, Dallas, for Legend Airlines.

Madeleine Johnson, City Atty., Dallas, Carrington, Coleman, Sloman & Blumenthal, L.L.P., James E. Coleman, Jr., Lyndon F. Bittle, Amy K. Hunt, Dallas, for City of Dallas.

Susman Godfrey, L.L.P., Randall W. Wilson, Houston, Susman Godfrey, L.L.P., E. Lawrence Vincent, Jr., Dallas, for Continental.

Kelly, Hart & Hallman, P.C., Dee J. Kelly, Brian S. Stagner, Fort Worth, for City of Fort Worth.

Harris, Finley & Bogle, P.C., Bill F. Bogle, Russell R. Barton, Fort Worth, Locke Liddell & Sapp, L.L.P., Morris Harrell, Michael V. Powell, Cynthia K. Timms, Gayle E. Rosenstein, Dallas, for American Airlines.

Panel A: CAYCE, C.J.; DAY * and DAUPHINOT, JJ.

## OPINION

JOHN CAYCE, Chief Justice.

The issues we decide in this appeal are 1) whether enforcement of restrictions on air passenger service at Love Field Airport contained in a 1968 Bond Ordinance between the City of Fort Worth and the City of Dallas are preempted by the Airline Deregulation Act, and 2) whether the air passenger service proposed by Legend Airlines, Inc., Continental Airlines, Inc., and Continental Express, Inc. is within the "commuter airlines" exceptions to the Wright and Shelby Amendments.[1] Because we conclude that the restrictions in the Bond Ordinance are preempted by the ADA and that the proposed service falls within the commuter airlines exceptions to the Wright and Shelby Amendments, we will reverse and render.

## BACKGROUND FACTS

In 1962, the Civil Aeronautics Board (CAB) instituted the Dallas–Fort Worth Regional Airport Investigation to determine whether public convenience required the two cities to consolidate commercial air passenger service at one airport. At the time, Dallas's commercial air traffic operated out of Love Field, while Fort Worth's airport was Greater Southwest International Airport (GSIA). The CAB stated that the use of multiple airports produced fragmented and more expensive service.

An evidentiary hearing was held before an administrative law judge, who ruled that neither Love Field nor GSIA could meet the future aviation requirements for the Dallas–Fort Worth area. The CAB then issued an order in September 1964, in which it concluded that "service to Dallas and Fort Worth should be required through a single airport." The CAB instructed the cities that if they did not agree on a single airport for all commercial passenger service, the CAB would designate one for them. The order provided:

> [W]e are aware of the practical difficulties involved in the transition to service through a single airport, and contemplate a voluntary arrangement.... Should the parties, contrary to our expectation, be unable to agree to designation of the airport to serve the area, the Board will then proceed promptly to issue a decision.

As a direct result of the CAB's order, the cities created the Dallas–Fort Worth International Airport (DFW). In April 1968, the cities entered into an agreement (the 1968 Agreement) that created a joint venture to build DFW. Under the 1968 Agreement, the cities are co-owners of DFW, which is operated on their behalf by the DFW Airport Board. The DFW Airport Board is comprised of members appointed by the two city councils.

In November 1968, the cities also passed the 1968 Regional Airport Concurrent

---

* Justice Sam J. Day has been substituted for Justice William Brigham, who retired on December 31, 1999. *See* TEX.R.APP. P. 41.1(b).

1. International Air Transportation Competition Act of 1979, Act of Feb. 15, 1980, Pub.L. No. 96–192, § 29, 1980 U.S.C.C.A.N. (94 Stat.) 35, 48 [the Wright Amendment]; Department of Transportation and Related Agencies Appropriations Act of 1998, Act of Oct. 27, 1997, Pub.L. No. 105–66, § 337, 1997 U.S.C.C.A.N. (111 Stat.) 1425, 1447 [the Shelby Amendment].

Bond Ordinance (the Bond Ordinance) to authorize the issuance of bonds to finance DFW. The Bond Ordinance provided that the cities would "take such steps as may be necessary, appropriate, and legally permissible ... to provide for the orderly, efficient and effective phase-out at Love Field [and other local airports] of any and all Certificated Air Carrier Services, and to transfer such activities to [DFW]."

After the 1968 Agreement was signed and the Bond Ordinance was passed, Fort Worth demolished GSIA, and Dallas required all federally certificated air carriers to transfer their operations from local airports under its control to DFW. The DFW Airport Board entered into use agreements with the major air carriers then serving the cities' local airports. In exchange for benefits accompanying "signatory" status, each of these carriers agreed to provide certificated air carrier services serving this region exclusively at DFW "to the extent required by the terms of the ... Bond Ordinance."

Southwest Airlines was not a signatory and refused to move its operations from Love Field to DFW. Dallas, Fort Worth, and the DFW Airport Board sued Southwest in federal court, seeking to exclude it from operating out of Love Field upon the opening of DFW. The federal court held that Dallas could not force Southwest to vacate Love Field as long as Love Field remained open, because Southwest was not a federally certificated air carrier and was flying only *intra* state routes.[2]

In 1978, Congress deregulated the airline industry by enacting the Airline Deregulation Act (ADA). The ADA expressly preempts and prohibits states and their political subdivisions from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."[3] After the ADA was passed, Southwest applied for and obtained federal certification to begin *inter* state service from Love Field to New Orleans.[4] Dallas, Fort Worth, and the DFW Airport Board opposed Southwest's application through an administrative appeal, but the appeal was unsuccessful.[5]

Southwest's success in obtaining federal authority to offer interstate service out of Love Field prompted former Fort Worth Congressman and Speaker of the House Jim Wright to seek legislation that, in its original form, would have barred all regularly scheduled interstate passenger flights from Love Field, except for "commuter airline operations."[6] The Dallas City Council passed a resolution expressing its support for this legislation. Although Congressman Wright's bill banning all interstate service at Love Field was adopted by the House, the Senate rejected it. The conference committee, however, reached a compromise that resulted in the legislation known as the Wright Amendment. The Wright Amendment prohibited the CAB and the Department of Transportation (DOT) from certificating interstate flights at Love Field, subject to two pertinent exceptions:

2. See *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 103 (5th Cir.) ("Southwest Airlines Co. has a federally declared right to the continued use of and access to Love Field, so long as Love Field remains open."), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977); *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1034–35 (N.D.Tex.1973) (same), *aff'd*, 494 F.2d 773 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974).

3. 49 U.S.C.A. § 41713(b)(1) (West Supp. 1999).

4. See *Cramer v. Skinner*, 931 F.2d 1020, 1023 (5th Cir.), *cert. denied*, 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991); *see also Kansas v. United States*, 16 F.3d 436, 438 (D.C.Cir.), *cert. denied*, 513 U.S. 945, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994).

5. See *Cramer*, 931 F.2d at 1023.

6. H.R. CONF. REP. No. 96–716, at 24 (1979), *reprinted in* 1980 U.S.C.C.A.N. 78, 86.

- commuter airlines operating aircraft with a passenger capacity of 56 passengers or less; and

- flights between Love Field and points in Louisiana, Arkansas, Oklahoma, New Mexico, and Texas, provided the carrier does not offer through ticketing or service beyond Texas and the four-state perimeter, either itself or through another airline.[7]

After passage of the Wright Amendment, Southwest began interstate service within the Amendment's parameters. In 1982, Dallas, Fort Worth, American Airlines, Inc., and the DFW Airport Board were permanently enjoined from litigating "the validity, effect, or enforceability of the [Bond Ordinance] ... insofar as it may affect the right of [Southwest] to the continued use of and access to Love Field."[8]

In July of 1992, the DOT published a study prepared by the Interdepartmental Task Force on the Wright Amendment (the Love Field Study Task Force) on the likely effects of repealing or loosening the restrictions on Love Field service under the Wright Amendment.[9] The study addressed five questions arising from a debate between members of Congress who sought to amend or repeal the Wright Amendment and members of the Texas congressional delegation who opposed those efforts:

- What will be the impact on competition and fares?

- How much capacity can Love Field add?

- What will be the impact of opening Love Field on the continued growth of DFW?

- Will travelers prefer Love Field over DFW?

- What are the likely environmental consequences of more air traffic at Love Field?[10]

In summary, the Love Field Study Task Force reported that expanding Love Field service through modification or repeal of the Wright Amendment would cause no significant harm to DFW and would greatly benefit the Dallas–Fort Worth metropolitan area. Specifically, the report concluded:

A change to the Wright Amendment will result in more service, more competition, lower fares, and more traffic for the Dallas–Fort Worth Metroplex and the region. Travellers to or from the Metroplex region will save an estimated $183 million per year in air fares. The amount of additional service that can be provided at Love Field beyond the 214,-000 annual operations today will be limited by airspace interactions caused by Love Field's proximity to Dallas–Fort Worth Airport and the orientation of its runways in relation to those at Dallas–Fort Worth Airport. Safety will be maintained by [Federal Aviation Administration]-imposed procedures, and noise impacts on the region will continue to decline as older "Stage 2" aircraft are phased out. Aircraft delays would become a significant problem only if operations reach the unlikely level of 360,000 operations annually. *Under all possible scenarios, Dallas–Fort Worth Airport will continue to grow and remain the region's dominant airport.* [Emphasis supplied.][11]

7. International Air Transportation Competition Act of 1979, Pub.L. No. 96–192, § 29, 1980 U.S.C.C.A.N. (94 Stat.) 48–49.

8. *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, No. CA–3–75–0340–C, slip op. at 4–5 (N.D.Tex.1982, order).

9. *See* ANALYSIS OF THE IMPACT OF CHANGES TO THE WRIGHT AMENDMENT, INTERDEPARTMENTAL TASK FORCE ON THE WRIGHT AMENDMENT (July 1992) [the Love Field Study] (attached as Appendix).

10. Love Field Study, Executive Summary at 2.

11. Love Field Study, Executive Summary at 1.

The DOT submitted the report to Congress, but made no recommendation on whether the Wright Amendment should be repealed or modified.

In 1996, Astraea Aviation Services, Inc. sought to enter the Dallas air passenger market by providing long distance flights from Love Field using large jet aircraft reconfigured to accommodate no more than 56 passengers. Astraea requested an opinion from the DOT that its proposed service would meet the requirements of the "commuter airlines" exception to the Wright Amendment. The DOT concluded that such service "would be contrary to the Congressional goals underlying the [Wright Amendment]" and that whether long-haul service should be allowed at Love Field "is a question that should be resolved by Congress." Astraea appealed the DOT's ruling to the Fifth Circuit.

Before the appeal was resolved, however, Congress adopted the Shelby Amendment, named after Senator Richard Shelby, Chairman of the Senate Appropriations Committee. The Shelby Amendment authorizes a limited increase in Love Field service in two respects:

- the Wright Amendment's "56 passengers or less" commuter airlines exception now includes most larger aircraft "reconfigured to accommodate 56 or fewer passengers"; and
- three states are added to the Love Field service area—Kansas, Alabama, and Mississippi.[12]

Soon after the enactment of the Shelby Amendment, Southwest began offering through service from Love Field to Mississippi and Alabama. In addition, Legend, a start-up airline, and Continental Express, both announced plans to begin new interstate service from Love Field.

## PROCEDURAL HISTORY

On October 10, 1997, Fort Worth filed the underlying suit against Dallas, Legend, and other entities who are not parties to this appeal. Fort Worth asked the trial court to declare that Dallas is contractually obligated by the cities' 1968 Agreement and Bond Ordinance to limit flights from Love Field to points within Texas and the four states contiguous to Texas: Oklahoma, Louisiana, New Mexico, and Arkansas. Dallas and Legend defended the suit by claiming that Dallas's obligations are preempted by federal law. American later intervened as a plaintiff.

In November 1997, Dallas filed suit in federal court against Fort Worth and the DOT, seeking a declaration that the Bond Ordinance is preempted by federal law.[13] Dallas's federal lawsuit was consolidated with a similar lawsuit filed by Continental Airlines and Continental Express (collectively, Continental).[14]

After the state court declaratory judgment action was filed, Continental scheduled flights between Love Field and Cleveland, Ohio, to begin July 1, 1998.

12. The text of the Shelby Amendment reads, in pertinent part:

Sec. 337 (a) IN GENERAL.—For purposes of the exception set forth in section 29(a)(2) of the International Air Transportation Competition Act of 1979 [the Wright Amendment] ..., the term "passenger capacity of 56 passengers or less" includes any aircraft, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56.

(b) INCLUSION OF CERTAIN STATES IN EXEMPTION.—The first sentence of section 29(c) of the International Air Transportation Competition Act of 1979 [the Wright Amend-

ment] ... is amended by inserting "Kansas, Alabama, Mississippi," before "and Texas". DOT Appropriations Act of 1998, Pub.L. No. 105–66, § 337, 1997 U.S.C.C.A.N. (111 Stat.) 1425, 1447.

13. *City of Dallas, Tex. v. Department of Transp.*, No. 3:97–CV–2734–T (N.D. Tex. filed Nov. 6, 1997).

14. *Continental Airlines, Inc. v. City of Dallas, Tex.*, No. 3:98–CV–1187–R (N.D. Tex. filed May 19, 1998). The federal district court has stayed the consolidated action pending resolution of the appeal from the 1998 DOT proceeding referenced herein.

As a result, Fort Worth and American added Continental as a defendant in the declaratory judgment action. The DFW Airport Board also filed a cross-claim against Continental and a counterclaim against American, asserting that the DFW use agreements barred signatories from offering interstate service at Love Field.[15] Fort Worth and the DFW Airport Board later obtained temporary injunctions prohibiting Continental's proposed flights to Cleveland.

In August 1998, the DOT began its own proceeding after requests for help from Fort Worth, Dallas, Legend, and several members of Congress. Dallas and Legend then moved to abate the state court suit on the ground that the trial court should defer to the primary jurisdiction of the DOT. The trial court denied the motions.

On October 15, 1998, the trial court rendered a partial summary judgment declaring that the 1968 Agreement and Bond Ordinance are valid, enforceable, and not preempted by federal law; that neither the ADA nor the Wright and Shelby Amendments convey affirmative rights that allow interstate passenger service from Love Field to points beyond Texas and the four-state perimeter established by the Wright Amendment; and that Dallas is obligated under the 1968 Agreement and Bond Ordinance to prohibit scheduled interstate passenger service beyond Texas and the four-state perimeter. The trial court denied Dallas's, Legend's, and Continental's controverting motions for summary judgment, and the partial summary judgment was made final on December 16, 1998.[16] This

state court appeal by Dallas, Legend, and Continental followed.

Meanwhile, on December 22, 1998, the DOT ruled that neither Dallas's commitments under the Bond Ordinance nor its rights as an airport proprietor under the ADA allow it to restrict services at Love Field that are authorized by federal law; that Dallas's ability to limit the type of airline service operated at Love Field is preempted by the Wright and Shelby Amendments; and that the commuter airlines exception allows any airline operating certain aircraft to make long-haul flights to or from Love Field.[17]

Fort Worth and American appealed the DOT's order to the United States Court of Appeals for the Fifth Circuit. On February 1, 2000, the Fifth Circuit affirmed the DOT's ruling.[18] Fort Worth and American petitioned for a writ of certiorari, challenging the Fifth Circuit decision in the United States Supreme Court.[19]

## ISSUES ON APPEAL

Dallas and Continental contend the DOT has primary jurisdiction to interpret federal aviation statutes, including the ADA and the Wright and Shelby Amendments, and that the trial court erred by not deferring to the mandate of the DOT's order. Notwithstanding this jurisdictional bar, all appellants contend the trial court judgment should be reversed and rendered in their favor because the Bond Ordinance restrictions on interstate service at Love Field are preempted by federal law under the ADA and, thus, Dallas's proprietary powers and rights do not authorize it to enforce the restrictions.[20] Appellants also

---

**15.** These claims have been severed into a separate case, and the DFW Airport Board is not a party to this appeal.

**16.** Astraea was dismissed as a party for lack of a justiciable controversy and certain interlocutory orders were merged into the judgment.

**17.** *See* Love Field Serv. Interp. Proc., DOT Decl. Order No. 98–12–27, 58 (1998).

**18.** *See American Airlines, Inc. v. Department of Transp.*, 202 F.3d 788 (5th Cir.2000), *petition for cert. filed*, 68 U.S.L.W. 3577 (U.S. Mar. 3, 2000) (No. 99–1462), 68 U.S.L.W. 3698 (U.S. May 1, 2000) (Nos.99–1739, 99–1745).

**19.** *See id.*

**20.** The dissent perceives that the primary issue in the trial court was whether the Agreement and Bond Ordinance contractually obli-

assert that the Bond Ordinance restrictions on interstate service at Love Field are preempted by the Wright and Shelby Amendments, and that the trial court erred in granting summary judgment because of the existence of material fact questions. Appellees contend the type of long-haul service proposed by Continental and Legend is not within the commuter airlines exception in the Wright and Shelby Amendments.

## STANDARD OF REVIEW

■ In a summary judgment case, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[21] Questions of law, such as the primary jurisdiction, preemption, and statutory interpretation issues presented here, are proper matters for summary judgment.[22]

## PRIMARY JURISDICTION OF THE DOT

■ The doctrine of primary jurisdiction is premised on the theory that "when the Legislature has delegated the power to an administrative body to regulate a particular industry or business, the courts may not or will not interfere until the

board or bureau has had an opportunity to pass upon the matter and has remedied, or attempted to remedy, the situation."[23] When an administrative agency has primary jurisdiction over the issues presented in a case, state and federal courts generally abate or dismiss the lawsuit pending the administrative agency's resolution of those issues.[24]

■ "[T]he test for applying the principle of primary jurisdiction is not whether some parts of the case are within the exclusive jurisdiction of the courts but whether some parts of the case are within the exclusive jurisdiction of the agency."[25] However, where the issue is inherently judicial in nature, "the courts are not ousted from jurisdiction unless the Legislature ... has explicitly granted exclusive jurisdiction to the administrative body."[26]

■ We believe the federal law issues in this case are inherently judicial in nature. While the DOT clearly is charged with *administering* the federal aviation laws,[27] we find no statutory grant of authority that gives the DOT *exclusive jurisdiction* to interpret and apply either the ADA or the Wright and Shelby Amendments. To the contrary, federal courts have routinely exercised their jurisdiction to determine preemption issues similar to those present-

gated Dallas to prohibit flights from Love Field beyond the four-state perimeter. However, this state law issue could not be addressed by the trial court, nor can it be addressed by this court on appeal, without first deciding the federal question of whether Dallas and Legend's defense of preemption precludes Dallas from fulfilling its contractual obligations under the Agreement and Bond Ordinance.

21. *See* Tex.R. Civ. P. 166a(c); *Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

22. *See Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222 (Tex.1999).

23. *Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411, 413 (1961).

24. *See Reiter v. Cooper,* 507 U.S. 258, 267, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993); *New England Legal Found. v. Massachusetts Port Auth.,* 883 F.2d 157, 171, 173 (1 st Cir. 1989); *Foree v. Crown Cent. Petro. Corp.,* 431 S.W.2d 312, 316 (Tex.1968); *Lens Express, Inc. v. Ewald,* 907 S.W.2d 64, 71 (Tex.App.—Austin 1995, no writ).

25. *Foree,* 431 S.W.2d at 316; *see also American Pawn & Jewelry, Inc. v. Kayal,* 923 S.W.2d 670, 674 (Tex.App.—Corpus Christi 1996, writ denied).

26. *Gregg,* 344 S.W.2d at 415.

27. *See Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 366–67, 114 S.Ct. 855, 863, 127 L.Ed.2d 183 (1994).

ed here.[28]

Accordingly, we hold the doctrine of primary jurisdiction does not apply to the federal law issues in this case.[29] Therefore, we conclude that the trial court did not err by not deferring to the DOT.

## PREEMPTION BY THE AIRLINE DEREGULATION ACT

In passing the ADA, Congress expressly preempted state and local regulations "related to a price, route, or service of an air carrier."[30] The ADA does not, however, preempt regulation of air service by local governments that own or operate airports if the regulation is an exercise of the owners' "proprietary powers and rights."[31]

The pertinent restrictions on interstate service in the Bond Ordinance are related to routes, because they require the transfer of all interstate flights from Love Field and other local airports to DFW.[32] Thus, the ADA preempts the route restrictions

in the Bond Ordinance and thus prohibits Dallas from enforcing the restrictions, unless enforcement of the restrictions is an exercise of Dallas's proprietary powers and rights as defined by the ADA.

The DOT concluded in its December 1998 order that Dallas's proprietary powers and rights as an airport owner or operator "do not allow it to restrict services at Love Field authorized by federal law." The Fifth Circuit agreed and held the DOT's order to be reasonable.[33]

While we do not have concurrent jurisdiction to review the validity of the DOT's order,[34] we do share jurisdiction with the Fifth Circuit to decide the preemption issues and to interpret the relevant provisions of the ADA. In so doing, we are not bound by the pronouncements of the Fifth Circuit; we are obligated only to follow the federal law decisions of the United States Supreme Court and the Texas Supreme Court.[35]

---

**28.** *See, e.g., Western Air Lines, Inc. v. Port Auth.*, 817 F.2d 222, 226 (2 nd Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988); *City of Houston v. Federal Aviation Admin.*, 679 F.2d 1184, 1195 (5 th Cir.1982). *But cf. Massachusetts Port Auth.*, 883 F.2d at 171, 175 (concluding that, while both the courts and the DOT have general jurisdiction to interpret the ADA's preemption provision, deference to the DOT's jurisdiction is "necessary if consistent and coherent policy [is] to emerge") (citation omitted).

**29.** *But cf. American Airlines, Inc.*, 202 F.3d at 800–01 ("[A]viation regulation [is] an area where federal concerns are preeminent and where DOT is charged with representing those concerns.... DOT's interpretive order is the first time that DOT ... has interpreted the Shelby Amendment. To allow the state court effectively to foreclose the administering agency from further consideration of the Shelby Amendment ... would trump the key federal interests that motivated Congress to create DOT and give it authority over these laws.") (citations omitted).

**30.** 49 U.S.C.A. § 41713(b)(1); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 2036–37, 119 L.Ed.2d 157 (1992); *National Helicopter Corp. v. New York*, 137 F.3d 81, 88 (2 nd Cir. 1998).

**31.** 49 U.S.C.A. § 41713(b)(3) (West 1997).

**32.** *See, e.g., Western Air Lines, Inc. v. Port Auth.*, 658 F.Supp. 952, 955 (S.D.N.Y.1986) (concluding that perimeter rule prohibiting nonstop flights to and from New York's La-Guardia airport was regulation related to routes), *aff'd*, 817 F.2d 222 (2 nd Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988).

**33.** *See American Airlines, Inc.*, 202 F.3d at 810, 813.

**34.** The federal appellate courts have exclusive jurisdiction over that review process. *See* 49 U.S.C.A. § 46110(c) (West 1997); *City of Rochester v. Bond*, 603 F.2d 927, 934 (D.C.Cir.1979) (holding that federal appellate courts' exclusive review under predecessor to section 46110(c) "preempt[s] the original jurisdiction of state courts as well as federal district courts").

**35.** *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex.1993) (holding that, in cases in which federal and state courts have concurrent jurisdiction, we are bound only by U.S. Supreme Court and Texas Supreme Court decisions).

Preemption of state or local law by federal statute is disfavored in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.[36] Preemption questions require an examination of congressional intent, whether express or implied.[37] "Congress explicitly may define the extent to which its enactments pre-empt state law."[38] In the absence of explicit statutory language, however, congressional intent to preempt may be inferred if federal law "occup[ies] a given field to the exclusion of state law," or where the state law actually conflicts with federal law and thus "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."[39]

The manifest purpose behind the ADA's preemption provision is to "ensure that the States would not undo federal deregulation with regulation of their own."[40] Even before enactment of the ADA, courts long adhered to the principle that airport proprietors play an "extremely limited role" in the national scheme of aviation regulation.[41] Congress has specified such a limited role "[t]o avoid interference with the preeminent authority of the federal government in the field of aviation" by preventing local airport proprietors from "infringing upon the federal government's turf."[42] Consequently, a local government's exercise of its proprietary rights is limited to reasonable, nonarbitrary, and nondiscriminatory rules that advance an articulated local interest.[43] Applying this rule, courts have upheld route restrictions imposed by local proprietors that were designed to address operational and safety concerns such as noise,[44] pollution,[45] and airport congestion.[46] One court has also suggested that route restrictions aimed at preventing an airport from having to shut down its operations may constitute a permissible exercise of proprietary power.[47] In each of these instances, the courts found the restrictions necessary to carry out a legitimate airport goal.[48]

In this case, appellees did not allege in the trial court, and they do not argue here, that enforcement of the Bond Ordinance restrictions is necessary to

---

**36.** See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981). The underlying rationale of the preemption doctrine is that the Supremacy Clause of the United States Constitution invalidates state and local laws that interfere with or are contrary to the laws of Congress. See id.

**37.** See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988).

**38.** Id.; see also Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 778 (5 th Cir.), cert. denied, 498 U.S. 926, 111 S.Ct. 307, 112 L.Ed.2d 261 (1990).

**39.** Schneidewind, 485 U.S. at 300, 108 S.Ct. at 1150–51.

**40.** American Airlines, Inc. v. Wolens, 513 U.S. 219, 222, 115 S.Ct. 817, 821, 130 L.Ed.2d 715 (1995) (quoting Morales, 504 U.S. at 378, 112 S.Ct. at 2034).

**41.** British Airways Bd. v. Port Auth., 564 F.2d 1002, 1010 (2 nd Cir.1977).

**42.** City of Houston, 679 F.2d at 1194.

**43.** See National Helicopter Corp., 137 F.3d at 88–89; Western Air Lines, Inc., 658 F.Supp. at 958.

**44.** See Santa Monica Airport Ass'n v. City of Santa Monica, 659 F.2d 100, 104 (9 th Cir. 1981).

**45.** See National Helicopter Corp., 137 F.3d at 88–89.

**46.** See Western Air Lines, Inc., 817 F.2d at 223.

**47.** See City of Houston, 679 F.2d at 1191.

**48.** See National Helicopter Corp., 137 F.3d at 89; Western Air Lines, Inc., 817 F.2d at 223; City of Houston, 679 F.2d at 1191; Santa Monica Airport Ass'n, 659 F.2d at 104; see also Love Field Serv. Interp. Proc., DOT Decl. Order No. 98–12–27, 32 (concluding that any restrictions imposed on airline operations must be necessary to carry out a legitimate airport goal).

abate present or future noise levels, air pollution, airport congestion,[49] or any other similar problem.[50] Nor have appellees asserted that the Bond Ordinance restrictions are necessary to protect DFW from becoming financially unviable.[51] Rather, appellees contend that enforcement of the Bond Ordinance restrictions is necessary to protect the competitive position of DFW as the region's dominant airport. They argue that Dallas has the proprietary power to enforce the restrictions at Love Field, so long as DFW accommodates all air passenger traffic on an unrestricted basis. This argument is undoubtedly sincere and not without merit; nonetheless, since the deregulation of the airline industry under the ADA, neither the federal courts nor any federal agency charged with the responsibility of administering the ADA has ever allowed a local government to impose restrictions at its own airport, or a neighboring airport, for the mere purpose of limiting competition with another airport preferred by that government.[52] To permit Dallas to restrict routes at Love Field for such a purpose—absent a showing that DFW would become financially unviable without the restrictions—would be contrary to the competition inherent in a deregulated industry, as well as the Con-

**49.** At the temporary injunction hearing, one of appellees' experts opined that short-term "chaos" may result from airlines following Continental into the Love Field market. According to another expert, an increase in flights at Love Field by as many as 200 per day could result in some delays at DFW because DFW and Love Field share the same air space. Appellees do not contend, however, that it is the avoidance of possible delays that necessitates enforcement of the Bond Ordinance restrictions.

**50.** In response to Continental's motion for summary judgment, Fort Worth argued that the cities enacted the Bond Ordinance after the CAB found safety, noise, and congestion problems at Love Field more than 30 years ago. However, there is no evidence in the record before us that indicates these problems still exist, or that allowing limited interstate service under the Shelby Amendment would create the same problems encountered in the 1960s when Love Field was the region's busiest airport. To the contrary, the uncontroverted Love Field Study indicates that limited Love Field service under the Shelby Amendment will not create operational or safety problems at either Love Field or DFW. Love Field Study, Executive Summary at 1.

**51.** *See, e.g., City of Houston*, 679 F.2d at 1191 (citing evidence that the lack of a perimeter rule could force the FAA to close an airport). While there is evidence in the summary judgment record that opening up Love Field service under the Shelby Amendment could result in loss of revenue to DFW, there is no support in the record for the proposition that DFW would become financially unviable or be forced to close its operations. Nor is there evidence that DFW would lose its regional dominance. Moreover, the evidence that does show potential revenue loss to DFW is speculative and inconclusive. For instance, although there is testimony that $1.6 billion annually in flight revenues would be "exposed" if Continental were allowed to fly from Love Field to Cleveland, Ohio, appellees' experts admitted they had no way of calculating how many passengers DFW would actually lose to Love Field. Joe Lopano, DFW's managing director of airport development, believed the opening of Love Field would have a "significant" impact on those revenues, but he could not quantify the potential impact to support this opinion. Appellees' experts also speculated that DFW could lose its national mega-hub status and become more like Houston Intercontinental Airport. Again, however, there is no evidence that even remotely indicates that there is a potential that DFW's operations will be shut down, or that it will lose its regional dominance, if Love Field service is allowed under the Shelby Amendment.

**52.** Appellees rely on a Colorado Supreme Court decision as authority for imposing route restrictions to limit competition. *See Arapahoe County Pub. Airport Auth. v. Centennial Express Airlines, Inc.*, 956 P.2d 587, 595–96 (Colo.1998). *Arapahoe* is factually distinguishable, and, to the arguable extent that it is not, we agree with the Fifth Circuit that it was wrongly decided and thus decline to follow it. *See American Airlines, Inc.*, 202 F.3d at 807 (holding *Arapahoe* to be factually distinguishable and "as deviating from the generally accepted rule"). We also note that the restrictions at issue in *Arapahoe* have subsequently been challenged by the FAA in a separate proceeding. *See Centennial Express Airlines v. Arapahoe County Pub. Airport Auth.;* DOT Docket Nos. 16–98–05, 13–94–25, 13–95–03.

gressional intent of the ADA that airport proprietors not "undo federal deregulation with regulation of their own."[53]

Appellees argue that the courts in *Western Air Lines* and *City of Houston* approved route restrictions that are similar to the restrictions at issue here. Those restrictions, however, were not upheld to limit competition between airports, but because the airport proprietors had demonstrated that the restrictions were necessary to achieve legitimate airport goals— the prevention of congestion,[54] "harsh environmental effects,"[55] and to prevent the shut down of operations at a neighboring airport.[56] In contrast, there is no showing here that the Bond Ordinance restrictions are necessary to further any legitimate operational or safety goal, or to maintain the financial viability of DFW. The finding of the Love Field Study Task Force that "Dallas–Fort Worth Airport will continue to grow and remain the region's dominant airport," if the restrictions on interstate service out of Love Field are modified in the manner presently allowed under the Shelby Amendment,[57] stands unchallenged in the record before us.

■ Finally, even if we were inclined to agree with appellees' position, we are not empowered to substitute our judgment for that of the DOT in this case. Under the clear mandate of the United States Supreme Court, we must give "controlling weight" to reasonable DOT interpretations of the ADA.[58] According to the court having exclusive jurisdiction to review the propriety of the DOT order, the DOT carefully considered all relevant factors and arrived at a reasonable conclusion in deciding that the 30–year–old Bond Ordinance restrictions on long-haul service at Love Field are unenforceable under the ADA.[59] We are, therefore, constrained to give the DOT order controlling weight even if we would decide the preemption issue differently.[60]

For the foregoing reasons, we hold that enforcement by Dallas of the Bond Ordinance restrictions at Love Field is not a permissible exercise of proprietary powers under the ADA.[61] Accordingly, we hold that the Bond Ordinance restrictions are preempted by the ADA.[62]

**53.** *Wolens*, 513 U.S. at 222, 115 S.Ct. at 821 (quoting *Morales*, 504 U.S. at 378, 112 S.Ct. at 2034).

**54.** *Western Air Lines, Inc.*, 817 F.2d at 223; *City of Houston*, 679 F.2d at 1188.

**55.** *City of Houston*, 679 F.2d at 1193.

**56.** *See id.* at 1191.

**57.** Love Field Study, Executive Summary at 1.

**58.** *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Northwest Airlines, Inc.*, 510 U.S. at 366–67, 114 S.Ct. at 863; *Texas Oil & Gas Ass'n v. United States Evntl. Protection Agency*, 161 F.3d 923, 937–38 (5 th Cir.1998); *see also Continental Air Lines, Inc. v. Department of Transp.*, 843 F.2d 1444, 1449, 1455 (D.C.Cir. 1988) (deferring to DOT's interpretation of Wright Amendment).

**59.** *See American Airlines, Inc.*, 202 F.3d at 813; *see also* 49 U.S.C.A. § 46110(c) (provid-

ing that federal appellate courts have exclusive jurisdiction to review DOT orders).

**60.** *See Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782.

**61.** *See National Helicopter Corp.*, 137 F.3d at 92; *City of Houston*, 679 F.2d at 1194. Our opinion should not be interpreted as concluding that Dallas is prohibited from enforcing reasonable, nonarbitrary, and nondiscriminatory route restrictions designed to advance articulated local interests, such as those identified in this opinion. We express no opinion on that issue, because the parties did not raise it in the trial court or in this appeal. For the same reason, we also express no opinion on the "due process considerations" mentioned by the dissent. *See* dissent, *infra* at 120–21. We are prohibited from addressing issues not raised by the parties in the trial court or on appeal. *See* TEX.R.APP. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) ( op. on reh'g).

**62.** In light of this holding, we need not consider whether Dallas is a multi-airport proprietor, whether the Wright and Shelby

## COMMUTER AIRLINES EXCEPTION

Appellees contend that the air passenger service out of Love Field proposed by Legend and Continental [63] is not within the commuter airlines exception in the Shelby Amendment. They assert the commuter airlines exception in the Shelby Amendment only authorizes short-haul service from Love Field, because the Wright Amendment was intended to limit Love Field to short-haul service and only short-haul turboprop aircraft had a passenger capacity of 56 or less when the Wright Amendment was enacted. "Commuter airlines" is not defined in either of the Amendments.[64]

The Wright Amendment excepts from its prohibition against interstate air passenger service at Love Field "air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less." When the Wright Amendment was enacted in 1979, only turboprop planes had a passenger capacity of 56 passengers or less. Such aircraft were only marketed for service on short-haul routes because they were severely limited in range. Consequently, the Wright Amendment has been interpreted to exclude larger aircraft with long-haul capabilities.[65] In recent years, however, aircraft manufacturers have developed regional jets that typically have no more than 56 seats and offer attractive service on long flights. Large aircraft can also be reconfigured to hold no more than 56 passengers.

■ The Shelby Amendment modifies the commuter airlines exemption by defin-

ing "passenger capacity of 56 passengers or less" to include "*any aircraft*, except aircraft exceeding gross aircraft weight of 300,000 pounds, *reconfigured* to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56." [Emphasis supplied.] In its order, the DOT interpreted this language to mean any airline operating "any aircraft with a capacity of no more than 56 passengers," whether regional jets, reconfigured large aircraft, or turboprop planes, with no geographical limit on the length of flight. Based on this interpretation, the DOT concluded that "any airline operating aircraft with a passenger capacity of no more than 56 passengers and a gross aircraft weight of no more than 300,000 pounds may operate service with any type of equipment and flights of any length from or to Love Field." In reaching this conclusion, the DOT stated:

> [E]ven if the Wright Amendment were unclear on [the meaning of "commuter airlines"], the enactment of the Shelby Amendment shows that Congress no longer intends to limit the commuter aircraft exemption to short-haul service. By expressly allowing any aircraft (except aircraft with a gross aircraft weight of more than 300,000 pounds) to qualify for the exemption, subject only to the maximum 56–passenger capacity limitation, Congress no longer wishes to limit the exemption to short-haul service.[66]

We agree with the DOT's analysis, and, because the Fifth Circuit has held that the

---

Amendments preempt the Bond Ordinance independent of the ADA, or whether the trial court erred in granting summary judgment because of the existence of material fact questions.

63. Continental plans to provide service to Cleveland, Ohio from Love Field, via Continental Express aircraft having 56 or fewer seats and weighing less than 300,000 pounds. Legend recently began offering flights from Love Field to Los Angeles, Washington D.C., and Las Vegas on reconfigured DC–9s.

64. *See Continental Air Lines, Inc.*, 843 F.2d at 1454 ("The language of the [commuter airlines exemption] is, we are persuaded, ambiguous[.]").

65. *See id.* at 1454–55; Love Field Serv. Interp. Proc., DOT Decl. Order No. 98–12–27, 49.

66. Love Field Serv. Interp. Proc., DOT Decl. Order No. 98–12–27, 50.

DOT's interpretation is reasonable, we give it "controlling weight." [67]

It is true that Congress intended to restrict the commuter aircraft exemption to short-haul service in turboprop aircraft having a 56–passenger capacity or less when it enacted the Wright Amendment. A plain reading of the Shelby Amendment, however, shows that congressional intent has shifted toward allowing commuter airlines to operate many types of aircraft out of Love Field that are capable of providing long-haul service.[68] Appellees' narrow definition of commuter airlines would frustrate this clear intent and render the express language of the Shelby Amendment meaningless.

## INJUNCTION AGAINST CONTINENTAL

Continental asserts the trial court erred by enjoining Continental Express from providing interstate air carrier service between Love Field and Cleveland, Ohio, and by limiting the injunction bond to $100,000. The propriety of the injunction and bond is now moot, however, because the trial court dissolved the injunction on February 8, 2000. Furthermore, we lack jurisdiction to consider Continental's complaints about the injunction and bond. The injunction order was severed from the underlying case and appealed separately.[69] We dismissed that appeal at Continental's request in December 1998. Because our plenary power over the appeal has expired,[70] we have no authority to vacate our judgment of dismissal and revisit those issues in this appeal.[71]

## CONCLUSION

In light of our holdings on the issues of primary jurisdiction, preemption by the ADA, the commuter airlines exception, and the dissolved injunction against Continental, we need not consider the parties' remaining issues. We reverse the trial court's judgment and render judgment denying the declaratory relief sought by appellees because the restrictions on Love Field air passenger service contained in the Bond Ordinance are preempted by the ADA. We also render judgment that the commuter airlines exception to the Shelby Amendment allows any airline operating any aircraft with a capacity of no more than 56 passengers and a gross weight of no more than 300,000 pounds to offer flights on that aircraft to or from Love Field without geographical limitation. We dismiss Continental's injunction issues.

DAUPHINOT, J., filed a dissenting opinion.

---

**67.** *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782; *see Continental Air Lines, Inc.,* 843 F.2d at 1449 ("Here [referring to the Wright Amendment], Congress fashioned a specific provision which the agency (once CAB, now DOT) has been called upon to interpret."); *see also American Airlines, Inc.,* 202 F.3d at 813 (declining to second-guess DOT's reasonable interpretation of the commuter airlines exception because "determinations of this nature are directly within DOT's expertise, not ours").

**68.** We note that none of the parties seriously contends that the limited long-haul service authorized by the Shelby Amendment will undermine Love Field's status as a primarily short-haul service airport.

**69.** The style of the injunction appeal was *Continental Airlines, Inc. v. City of Fort Worth, Tex.,* No. 2–98–211–CV (Tex.App.—Fort Worth 1998, no pet.) (not designated for publication).

**70.** *See* Tex.R.App. P. 19.1(a).

**71.** *See id.* 19.3. ("After its plenary power expires, the court cannot vacate or modify its judgment.").

APPENDIX

**U.S. Department
of Transportation**

*Executive Summary*

# ANALYSIS OF THE IMPACT OF CHANGES TO THE WRIGHT AMENDMENT

Prepared by:

**INTERDEPARTMENTAL TASK FORCE
ON THE WRIGHT AMENDMENT**

July 1992

AB 000643

## Executive Summary

### Overview.

Dallas-Fort Worth International Airport opened in 1974. To ensure its success and to provide assurance that the airport could meet its bond obligations, the cities of Dallas and Fort Worth agreed to move commercial passenger operations from Love Field in Dallas and Meacham Field in Fort Worth to Dallas-Fort Worth Airport. At that time, most of the major carriers serving the area signed an agreement to transfer their operations. Only Southwest Airlines--then a small, intra-state carrier--did not sign, and was subsequently found eligible by the courts to continue to provide intra-state service from Love Field. With airline deregulation in 1978, Southwest, with court approval, expanded its service to New Orleans from Love Field. Concern arose that other carriers might seek to provide expanded service from Love Field, a move that might dilute the service from and financial standing of Dallas-Fort Worth Airport. The legislative result of that concern was the Wright Amendment--a provision contained in the International Air Transportation Competition Act of 1979--that expressly prohibits non-stop air service (and through-ticketing and through-service) between Dallas Love Field and cities other than those in Texas, Arkansas, Louisiana, New Mexico, and Oklahoma.

Since enactment of the Wright Amendment, two views of its potential impacts have developed. On one hand, many believe that the Amendment's restrictions limit the benefits of Southwest's lower-fare structure as well as the potential economic contribution of Love Field. As a result, residents outside the five state area, as well as some residents of Dallas, have argued for changes to the Amendment in order to allow Southwest to expand its operations from Love Field and provide low-fare service to more cities. On the other hand, others feel that removing or changing the current restrictions would break the agreement between the cities of Dallas and Fort Worth that has served as the foundation for regional economic planning and development. They also contend that expanding service at Love Field would compromise the justification to expand Dallas-Fort Worth Airport, lessen rather than increase consumer choice and service, and reduce the margin of safety.

### Results in Brief.

A change to the Wright Amendment will result in more service, more competition, lower fares, and more traffic for the Dallas-Fort Worth Metroplex and the region. Travellers to or from the Metroplex region will save an estimated $183 million per year in air fares. The amount of additional service that can be provided at Love Field beyond the 214,000 annual operations today will be limited by airspace interactions caused by Love Field's proximity to Dallas-Fort Worth Airport and the orientation of its runways in relation to those at Dallas-Fort Worth Airport. Safety will be maintained by FAA-imposed procedures, and noise impacts on the region will continue to decline as older "Stage 2" aircraft are phased out. Aircraft delays would become a significant problem only if operations reach the unlikely level of 360,000 operations annually. Under all possible scenarios, Dallas-Fort Worth Airport will continue to grow and remain the region's dominant airport.

AB 000644

### Study Approach and Results.

This study evaluates five questions surrounding change to the Wright Amendment:

- What will be the impact on competition and fares?

- How much capacity can Love Field add?

- What will be the impact of opening Love Field on the continued growth of Dallas-Fort Worth Airport?

- Will travelers prefer Love Field over Dallas-Fort Worth Airport?

- What are the likely environmental consequences of more air traffic at Love Field?

This study evaluates these questions by considering two alternatives to the Amendment: modification, which would allow some new service, and repeal. Repeal was evaluated according to three different possible service levels at Love Field.

- **Base Case**. The Wright Amendment will be retained in its present form.

- **Modified Wright**. A change permitting non-stop flights of up to 650 miles and through-service and through-ticketing to any destination beyond.

- **Repeal/Equal Access**. Carriers serve Love Field by focusing on service to their major hubs and Southwest adds service to a limited number of cities beyond the 650 miles noted above.

- **Repeal/Origin and Destination**. Love Field becomes a major origin and destination base (70 flights a day) by a carrier other than Southwest.

- **Repeal/Major Hub** - An airline, other than Southwest, decides to establish Love Field as a hub (230 flights a day).

Figure ES.1. presents the existing Wright Amendment service restriction as well as the 650 mile limit of the Modified Wright scenario.

AB 000645

## Figure ES.1. Existing and Modified Wright Amendment Service Limits From Dallas Love Field

| KEY: | | |
|---|---|---|
| | ▓▓▓ | Wright Amendment Service Area |
| | ▬▬ | Modified Wright Amendment (650 Statute-Mile) Service Area |

AB 000646

<u>What will be the impact on competition and fares?</u> With a few exceptions, the Wright Amendment limits service from Love Field to that provided by Southwest Airlines. If the Wright Amendment were changed, competition and fares in the Metroplex would be affected in two ways.

*First*, new service by Southwest Airlines from Love Field would likely include a number of new cities (see Table ES.1). This would result in increased competition for service from Dallas-Fort Worth Airport and should result in net increases in service for the Metroplex. Other carriers are also likely to add non-stop service from Love Field to their hubs. Only if carriers choose to shift flights from Dallas-Fort Worth Airport to Love Field rather than to supplement existing service would the diversity of air service from Dallas-Fort Worth Airport be reduced.

Table ES.1.
Market Entry By Southwest Airlines to/from the
Metroplex Following Change to
the Wright Amendment

| Most Likely Non-Stop Markets | Most Likely Key One-Stop and Connecting Markets |
| --- | --- |
| **South:** | **South:** |
| Birmingham | Nashville |
| Memphis | |
| | **Midwest:** |
| **Midwest:** | |
| | Chicago |
| Kansas City | Detroit |
| St. Louis | Indianapolis |
| **West:** | **West:** |
| Phoenix | Burbank |
| | Las Vegas |
| | Oakland |
| | Ontario (CA) |
| | Reno |
| | San Diego |
| | San Francisco |

The non-stop cities listed above represent the most likely additional entry points from Love Field given Southwest Airlines' current operating pattern. Analysis suggests that Southwest may enter a limited number of additional cities (all smaller in population than those shown).

AB 000647

Second, Southwest Airlines' low-fare structure and frequent service would have an impact on demand for air travel in the southwestern region. For example, when Southwest has initiated service in a market in the past, fares for service in that market have fallen by an average of 22 percent and traffic has increased by 50 percent. Furthermore, fares for those markets with non-stop service from both Love Field (provided by Southwest) and Dallas-Fort Worth Airport (provided by various airlines) average 39 percent *below* the standard industry fare level--the Civil Aeronautics Board pre-deregulation fare formula adjusted for cost increases. Fares for markets for which service is only available from Dallas-Fort Worth Airport (with no service by Southwest), on the other hand, average 19 percent *above* the standard industry fare level (see Figure ES.2) .

*Figure ES.2. Average Fare and Standard Industry Fare Level for Non-Stop Jet Markets Served from Love Field and Dallas-Fort Worth (1990)*

Source: Apogee Research based on data from U.S. Department of Transportation

5

AB 000648

If the Wright Amendment were repealed, travelers to or from the Metroplex could conservatively expect to realize an estimated annual fare savings of $183 million (in 1991 dollars, see Table ES.2). This result would be slightly lower (approximately 5 to 10 percent) if the Wright Amendment were modified rather than repealed.

Table ES.2.
Annual Fare Savings by Market Resulting From Wright Amendment Repeal

| MARKET (From the Metroplex) | Forecast 1996 Passengers[a] | Additional 1996 Passengers[b] | Average Fare Savings (Millions of 1991 Dollars) |
|---|---|---|---|
| *Non-Stop Markets* | | | |
| Birmingham | 60,000 | 23,000 | $ 3.1 |
| Kansas City | 209,000 | 128,000 | 18.1 |
| Memphis | 113,000 | 64,000 | 8.4 |
| Phoenix | 263,000 | 161,000 | 22.7 |
| St. Louis | 295,000 | 168,000 | 23.2 |
| *One-Stop and Connecting Markets* | | | |
| Nashville | 133,000 | 30,000 | 3.4 |
| Burbank | 64,000 | 15,000 | 2.2 |
| Chicago | 817,000 | 334,000 | 45.7 |
| Detroit | 292,000 | 53,000 | 5.4 |
| Indianapolis | 128,000 | 29,000 | 3.3 |
| Las Vegas | 216,000 | 49,000 | 4.6 |
| Oakland | 79,000 | 34,000 | 5.9 |
| Ontario | 122,000 | 28,000 | 3.8 |
| Reno | 53,000 | 12,000 | 1.4 |
| San Diego | 185,000 | 42,000 | 5.4 |
| San Francisco | 299,000 | 143,000 | 26.4 |
| **TOTAL** | **3,328,000** | **1,313,000** | **$183.0** |

Notes:
a) Market forecast based on 1990 U.S. Department of Transportation Survey of Origin and Destination Passengers for each city pair, forecast to grow at rate of the Terminal Area Forecasts provided by the Federal Aviation Administration.
b) Demand would increase by less than the 50 percent non-stop average since many of the markets would only be affected by multiple stop (through-ticketing) service.

AB 000649

**How much capacity can Love Field add?** Dallas Love Field is located about 4 1/2 miles from the Dallas central business district and 12 miles east of Dallas-Fort Worth Airport. While Love Field is closer to downtown Dallas than is Dallas-Fort Worth Airport, access is limited to two signal-controlled roads expected to reach capacity within the next 5 to 10 years. The airfield is a fully developed 1,300-acre site with two parallel runways (each with Instrument Landing Systems) capable of handling most domestic aircraft operations and one shorter north-south runway used for light general aviation aircraft. Industrial and residential development adjacent to Love Field make it impractical to add new capacity through land acquisition. Thus, the potential for expanded air service at Love Field is a function of the airspace and terminal capacity.

**Airspace capacity** is clearly an important constraint to expanding service at Love Field. Love Field's two main runways are at an angle to Dallas-Fort Worth Airport's main north-south runways, resulting in airspace limitations between traffic approaching or departing Dallas-Fort Worth Airport and Love Field in the north. This orientation, coupled with the proximity of the two airports and the high-activity levels in the area creates airspace limitations on Love Field operations (see Figure ES.3). Further, any change in airspace rules to increase the capacity at Love Field would result in a decrease in capacity for Dallas-Fort Worth Airport. Thus, the most effective airspace configuration for the region remains that of the Federal Aviation Administration's recently completed *Metroplex Plan*, now being implemented.

### Figure ES.3. Dallas-Fort Worth Airport and Love Field Federal Aviation Administration Arrival and Departure Paths

KEY:
— Existing Runway
— — — Proposed Runway

— Love Arrivals
▪▪▪▪ Love Departures
— DFW Arrivals
▪▪▪▪ DFW Departures

Notes: Schematic not to scale.
Boxes around airports are for identification and do not show boundaries.

AB 000650

Changing the Wright Amendment to establish a 650-mile perimeter with through-service and through-ticketing would not result in unmanageable capacity or delay problems. This is largely true under repeal also, provided that carriers do not elect to establish hub operations at Love Field (see Figure ES.4). If Love Field were to become a major hub, capacity and delays would become much more serious concerns. Under repeal, two conditions unique to the Metroplex airspace would become increasingly important as activity at Love Field increased. First, south-flow arrivals (which occur 70 percent of the time) are limited to a single stream at Love Field due to competing airspace with Dallas-Fort Worth Airport. Second, all departures from the Dallas-Fort Worth area use common airspace for each aircraft type. Thus, for example, if two planes of the same type, one at Love Field and one at Dallas-Fort Worth Airport, are set to depart for the same destination, one might have to wait. These conditions are not expected to engender significant delays under repeal, as long as carriers limit their Love Field operations to servicing existing hubs, as illustrated by the Equal Access scenario. But any operations beyond that level, such as operating Love Field as a major hub, could result in serious delay problems.

### Figure ES.4. Relationship Between Operations and Delay at Love Field (with 1996 Scenario Forecasts)

Source: Howard Needles Tammen Bergendorf based on forecasts prepared by
Apogee Research and FAA Airport Capacity and Delay Model.

AB 000651

The terminal at Love Field will support an increase in airline passenger operations. but will not support a hub operation at Love Field without the construction of new terminal facilities. The terminal, located between the parallel runways, has three concourses. The west concourse is used by Southwest Airlines. The north and east concourses have not been used for scheduled commercial passenger service for a number of years and most space has been leased out for commercial enterprises. At present, 13 active passenger loading gates are in use by Southwest. An additional 15 gates could be opened with little or no reconstruction. Major reconstruction would yield 25 more gates, bringing the total to 53 gates. (see Figure ES.5).

## Figure ES.5. Gates Required by Scenario at Love Field (1996)

Source: Howard Needles Tammen Bergendorf

9

AB 000652

**What will be the impact of opening Love Field on the continued growth of Dallas-Fort Worth Airport?** It has been suggested that growth at Dallas-Fort Worth Airport could be affected by (1) a shift in operations to Love Field, and (2) operational delays and delays in constructing planned new runways.

Changing the Wright Amendment to allow a 650 mile limit and through-service and through-ticketing or repealing the Wright Amendment with other carriers serving their hubs from Love Field will have little if any impact on Dallas-Fort Worth Airport's growth. Only if the Amendment is repealed and a carrier establishes a major origin and destination base or a major hub at Love Field would Dallas-Fort Worth Airport face a shift in operations, the possibility of additional delays, or delays to expansion plans. To achieve either scenario (major origin and destination or major hub), however, an air carrier must be willing to accept additional delays at Love Field and, as a consequence, sacrifice service.

For example, using estimated forecast average daily domestic jet departures from Love Field and Dallas-Fort Worth Airport as one measure, Dallas-Fort Worth Airport operations drop from 950 under the Equal Access scenario to 881 under the Major Hub, with a corresponding shift upward--from 251 to 463 daily jet departures--at Love Field (see Figure ES.6).

### Figure ES.6. Estimated Daily Jet Departures from Dallas-Fort Worth Airport and Love Field: 1990 and 1996

Source: Apogee Research, Inc.

AB 000652

Furthermore, because Dallas-Fort Worth Airport will remain the region's primary airport under any scenario (both in terms of operations and for airspace planning purposes), traffic to Love Field will not have any detrimental impact on Dallas-Fort Worth Airport's capacity--except under the extreme scenario of the Major Hub at Love Field. For example, using SIMMOD, a Federal Aviation Administration computer airspace and airport simulation model, ATAC Corporation concluded (in March 1990) that an increase to 955 daily operations at Love Field--an increase of more than 50 percent over 1990 operations and one within the forecast levels for both the Modified Wright and Equal Access scenarios--would not result in additional delays at Dallas-Fort Worth Airport (see Figure ES.7). This will remain the case even though the development schedule for Dallas-Fort Worth Airport calls for two new runways to be completed, one in 1994 and the second in 1997. Existing air traffic procedures at Love Field will have to be modified slightly to accommodate the proposed new runways, but these modifications will not change arrival and departure capacity levels forecast for Love Field.

## Figure ES.7. Average Daily Activity at Love Field 1990 and 1996

Source: Apogee Research, Inc.

KEY:
Other
General Aviation
Air Carrier

11

AB 000654

Will travelers prefer Love Field over Dallas-Fort Worth Airport? Some carriers serving Dallas-Fort Worth Airport have expressed concern that Love Field, because of its geographic proximity to the City of Dallas, would be the "preferred" airport.

Data provided by the North Central Texas Council of Governments show, however, that the time to drive to Dallas-Fort Worth Airport is actually shorter than to Love Field for the majority of the Metroplex population and workforce. Furthermore, access to Dallas-Fort Worth Airport will improve through 2010, while access to Love Field will deteriorate. For example, the percentage of Metroplex households within 45 minutes' drive of Love Field is expected to fall from the 1986 level of 67 percent to 62 percent by 2010. Conversely, the percent within 45 minutes of Dallas-Fort Worth Airport is expected to grow from 86 percent in 1986 to 88 percent in 2010 (see Figure ES.8).

### Figure ES.8. Percentage of Metroplex Population Served By Travel Time Contour Interval

KEY:
- 0-15 minutes
- 15-30 minutes
- 30-45 minutes
- 45-60 minutes
- 60+ minutes

Source: Apogee Research from North Central Texas Council of Governments data.

12

AB 000655

Further, Dallas-Fort Worth Airport is closer to the higher-income areas--the areas whose residents have a higher propensity to fly--than is Love Field, an advantage that will also grow over time (see Figure ES.9).

## Figure ES.9. Median Income by Travel Time Contour Interval 1986 and 2010

Source: Apogee Research, Inc., based on data from North Central Texas Council of Governments.

AB 000656

**What are the likely environmental consequences of more air traffic at Love Field?**
The primary environmental consequence of any change to the Wright Amendment is noise.

Aircraft noise will be reduced from current levels under any of the scenarios examined primarily due to the change to a quieter "Stage 3" airline fleet and the phase-out of some older, noisier general aviation aircraft. In 1989, for example, 29,000 people lived within an area equal to or in excess of noise levels deemed compatible with residential development by the Federal Aviation Administration (technically termed the "65 Ldn" line) (see Figure ES.10). Even with an increase in operations, that number is expected to decline dramatically over the next 10 years.

## Figure ES.10. Population Within 65 Ldn at Love Field

Source:  Howard Needles Tammen Bergendorf

AB 000657

14

The complete report is available from:

Office of Policy and Plans
Federal Aviation Administration
800 Independence Avenue, S.W.
Washington, D.C. 20591

AB 000658

DAUPHINOT, Justice, dissenting.

## INTRODUCTION

I agree with the majority's holding that the doctrine of primary jurisdiction does not apply to the federal law issues in this case and with the majority's dismissal of Continental's injunction issues for want of jurisdiction. I, however, write separately to dissent to the majority's interpreting the commuter airlines exception in the Shelby Amendment and to the majority's holding that the Bond Ordinance restrictions are preempted by the ADA.

## FACTUAL AND PROCEDURAL BACKGROUND

The history of this case is an especially disturbing picture of the tension between federal and local government authority. In the early 1960s, Dallas's principal airport was Love Field, while Fort Worth's principal airport was Greater Southwest International Airport (GSIA), which Fort Worth had recently constructed in a sparsely populated area equidistant between the two cities.

On August 20, 1962, the Civil Aeronautics Board (the CAB), the predecessor of the Department of Transportation (the DOT), began an investigation to determine whether public convenience and necessity required Dallas and Fort Worth to consolidate air passenger service at a single airport. The Federal Aviation Administration (the FAA) participated extensively in the proceeding and concluded that Love Field could not serve as the primary airport for the Dallas–Fort Worth area because of environmental and safety considerations:

because of its physical limitations, because of the intensely developed and highly valuable property surrounding Love Field; because of the obvious fact that any further lengthening of the run-

ways at Love Field would serve merely to compound the aircraft noise problem, and for other equally good reasons, it appears that Love Field cannot be developed economically into the type of facility needed to serve the future requirements of this area.... At Love Field, the close-in portion of all approach areas to all runways is over either residential, commercial, or industrial areas which are densely populated. The FAA has imposed restrictions to make these operations equal to the established minimum safety requirements. It is clear, however, [that] safety to the occupants of an aircraft and to the people on the ground is infinitely greater if the approaches to the airport are clear and the path that the aircraft is required to fly is not over highly populated areas. Accident statistics show that during the period from 1955 through 1962, 11% of air carrier accidents occurred within 5 miles of the approach end of the runway. More than half of this 11% occurred within 1 mile of the approach end of the runway. *It is apparent that an accident of this nature at Love Field would be catastrophic.* [Emphasis added.]

On April 7, 1964, the administrative law judge concluded that it would not be in the public interest to designate either GSIA or Love Field as the regional airport. On September 30, 1964, the CAB issued an order stating that it was "of the unanimous opinion that service to Dallas and Fort Worth should be required through a single airport" and giving Dallas and Fort Worth 180 days "within which to arrive at a voluntary agreement concerning the location of the airport to be used for the consolidated service." The CAB's order further provided that if the cities failed to reach an agreement, the CAB itself would designate the regional airport.

Because of the CAB's order, on April 15, 1968 the cities entered into a contract and agreement (the Agreement) to build Dallas–Fort Worth International Airport (DFW). Under the Agreement, the cities are joint owners of DFW, and the Dallas–Fort Worth International Airport Board (the DFW Board) operates DFW on behalf of the cities. To finance the construction of DFW, the cities adopted the 1968 Regional Airport Concurrent Bond Ordinance (the Bond Ordinance) on November 12, 1968. Under the Bond Ordinance, the cities have sold approximately two billion dollars in DFW revenue bonds; approximately one billion dollars in bonds remain outstanding. Section 9.5(A) of the Bond Ordinance requires the cities to

take such steps as may be necessary, appropriate, and legally permissible (without violating presently outstanding legal commitments or covenants prohibiting such action), to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services, and to transfer such activities to [DFW]....

DFW was built in a location that overlapped the existing GSIA, thus requiring Fort Worth to demolish GSIA and to abandon GSIA as an airport. Dallas states that it "intended, to the extent legally permissible and without closing Love Field to all other aviation activities, to phase out virtually all, if not all, scheduled certificated air carrier traffic at Love Field, and to transfer such traffic to [DFW] upon its completion." In accordance with this intent, Dallas required all CAB-certificated carriers at Love Field to sign letter agreements that they would move all of their Certificated Air Carrier Services serving the Dallas–Fort Worth area to DFW to the extent required under the terms of the Bond Ordinance.[1] Despite the CAB-mandated Agreement and Bond Ordinance, Southwest Airlines (Southwest) refused to

---

1. *See City of Dallas v. Continental Airlines, Inc.,* 735 S.W.2d 496, 498 (Tex.App.—Dallas 1987, writ denied).

move from Love Field to DFW.[2] The Fifth Circuit Court of Appeals held in 1977, thirteen years after the CAB's order, that Southwest has a "federally declared right to the continued use of and access to Love Field, so long as Love Field remains open."[3]

Congress deregulated the airline industry in 1978 by enacting the Airline Deregulation Act (ADA). The ADA's preemption clause provides that a state, a political subdivision of a state, or a political authority of at least two states "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."[4] Southwest immediately applied for and was granted permission to provide interstate service between Love Field and New Orleans.[5]

To limit interstate service at Love Field, Congress enacted the Wright Amendment to the ADA. Although the Wright Amendment banned interstate flights at Love Field, it exempted from the ban: (1) commuter flights on aircraft with a passenger capacity of fifty-six passengers or less, and (2) flights between Love Field and points in Texas, Louisiana, Arkansas, Oklahoma, and New Mexico, if the airline did not provide through ticketing or service beyond Texas and the four states contiguous to Texas.[6]

When Astraea Aviation Services, Inc. (Astraea) announced plans to provide long distance flights from Love Field on jets reconfigured to hold no more than fifty-six passengers, the DOT determined that such service would not be within the scope of the commuter aircraft exemption and therefore would be barred by the Wright Amendment. Congress responded in 1997 by enacting the Shelby Amendment to the ADA, which expanded services at Love Field by: (1) including aircraft weighing less than 300,000 pounds that had been reconfigured to seat fifty-six or fewer passengers within the Wright Amendment's fifty-six passengers or less commuter airlines exemption; and (2) expanding the Wright Amendment's contiguous state exemption to include Kansas, Alabama, and Mississippi.[7]

On October 10, 1997, Fort Worth filed a declaratory judgment action against Dallas; the DFW Board; Jeffrey P. Fegan, DFW's executive director (Fegan); Legend Airlines, Inc. (Legend); and Astraea in the 48th District Court of Tarrant County, Texas. Continental Airlines, Inc. and Continental Express, Inc. (collectively, Continental) and Mesa Airlines, Inc. (Mesa) were later added as defendants. Fort Worth sought a judgment declaring that:

(1) Dallas is prohibited, under the Agreement and the Bond Ordinance, from permitting any scheduled interstate passenger service to and from Love Field, unless such service is restricted to turn-around service to the four contiguous states;

(2) Dallas has the contractual and fiduciary obligation to take all necessary and lawful action to ensure compliance with the

**2.** *See Cramer v. Skinner,* 931 F.2d 1020, 1023 (5th Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991).

**3.** *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.,* 546 F.2d 84, 103 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977).

**4.** 49 U.S.C.A. § 41713(b)(1) (West Supp. 1999).

**5.** *See Cramer,* 931 F.2d at 1023; *see also Kansas v. United States,* 16 F.3d 436, 438

(D.C.Cir.), *cert. denied,* 513 U.S. 945, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994).

**6.** International Air Transportation Competition Act of 1979, Act of Feb. 15, 1980, Pub.L. No. 96–192, § 29, 1980 U.S.C.C.A.N. (94 Stat.) 35, 48–49 (1980).

**7.** Department of Transportation and Related Agencies Appropriations Act of 1998, § 337, Act of Oct. 27, 1997, Pub.L. No. 105–66, 1997 U.S.C.C.A.N. (111 Stat.) 1425, 1447.

Agreement and the Bond Ordinance, including, if necessary, phasing out all Love Field operations;

(3) if Dallas permits Legend, Astraea, Continental, or any other Certificated Air Carrier to provide scheduled interstate passenger service from Love Field other than restricted turn-around service to the four contiguous states, it will have placed Love Field in direct competition with DFW and thus will be in breach of its fiduciary and contractual duties relating to the purchase, construction, improvement, use, and development of DFW;

(4) the DFW Board may not, consistent with the Agreement, the Bond Ordinance, the DFW Board's representations to those who invested at DFW and the owners of DFW Airport Revenue Bonds, and the DFW Board's separate and independent fiduciary duties to develop and protect DFW, allow interstate passenger service from Love Field unless such service is restricted to turn-around service to the four contiguous states or the DFW Board allows such service only after making a determination pursuant to section 9.5 of the Bond Ordinance that such service is necessary in the interest of public safety, in the interest of prudent and efficient operations at DFW, or in the interest of satisfying an overriding public need for decentralized Certificated Air Carrier Services in the Dallas–Fort Worth metropolitan area considered as a whole;

(5) Fegan must, consistent with the Agreement, the Bond Ordinance, his and the DFW Board's representations to the public, his and the DFW Board's separate and independent fiduciary duties to develop and protect DFW, and his capacity as advisor to the DFW Board, act consistent with the trial court's declaratory judgment that interstate passenger service from Love Field is permitted only if such service is restricted to turn-around service to the four contiguous states;

(6) the DFW Board and Fegan cannot waive the application and obligations of the Agreement and the Bond Ordinance ex-

cept as expressly provided by the Agreement and the Bond Ordinance and only with the consent and agreement of the cities; and

(7) Mesa is bound by the Agreement and the Bond Ordinance covenants, which are expressly incorporated into the Use Agreement entered into by Fort Worth and Mesa, and cannot provide scheduled interstate passenger service from Meacham Airport.

American Airlines (American) intervened in the suit as a plaintiff on November 7, 1997, asking the trial court to declare the parties' rights, status, and other legal relations under the Agreement and the Bond Ordinance as follows:

(1) the Bond Ordinance requires Legend and Astraea to conduct their proposed scheduled interstate passenger operations to, from, and at DFW and precludes them from conducting such operations to, from, or at Love Field;

(2) absent agreement by Dallas, Fort Worth, and the DFW Board as provided in the Bond Ordinance, the Bond Ordinance requires scheduled interstate passenger service to and from states beyond the four states contiguous to Texas to be conducted from DFW, not from Love Field;

(3) Dallas, the DFW Board, and Fegan are required to enforce the Bond Ordinance and are estopped to deny the enforceability of the Bond Ordinance in the circumstances presented here;

(4) Dallas may not permit, allow, or take action that would encourage, facilitate, or support operation of Certificated Air Carrier Services to, from, or at Love Field, except for the limited turn-around service to the four states contiguous to Texas to which the cities and the DFW Board agreed in 1980;

(5) permitting Certificated Air Carrier Services to operate to, from, or at Love Field, except for the limited turn-around service to which the cities and the DFW Board agreed in 1980 would be a breach of

the cities' agreement with the owners of DFW revenue bonds and, thus, would be prohibited by the Texas Constitution; and

(6) other declarations as may be necessary or appropriate to resolve the disputes and controversies between the parties.

On October 1, 1998, the trial court heard motions for summary judgment filed by Fort Worth, American, Dallas, Continental, and the DFW Board. On October 15, 1998, the trial court signed a partial summary judgment and order and made the following findings:

(F1) The Agreement and the Bond Ordinance are valid and enforceable and are not preempted by federal law.

(F2) Dallas and Fort Worth have agreed not to enforce the Agreement and the Bond Ordinance insofar as it related to scheduled passenger service to or from Love Field to points within Texas and the four contiguous states, and Fort Worth does not seek to enforce the Agreement and the Bond Ordinance with respect to scheduled passenger service within Texas and the four contiguous states.

(F3) As owner of Love Field and Redbird airports, and as co-owner of DFW, Dallas is a multi-airport proprietor with a federally reserved proprietary right and power to restrict scheduled passenger service at Love Field to points within Texas and the four contiguous states.

(F4) The ADA, the Wright Amendment, and the Shelby Amendment do not convey affirmative rights that allow interstate passenger service from Love Field to points beyond Texas and the four contiguous states.

(F5) No justiciable controversy exists as to Astraea and Mesa.

On December 16, 1998, the trial court entered its final judgment that:

(D1) Dallas is obligated to prohibit scheduled interstate passenger service to or from Love Field to points beyond the four contiguous states, including the flights proposed by Legend and Continental.

(D2) If Dallas does not prohibit scheduled interstate passenger service to or from Love Field to points beyond the four contiguous states, including the flights proposed by Legend and Continental, Dallas will breach the Agreement, the Bond Ordinance, and the agreement referred to in (F2).

(D3) Section 9.5 of the Bond Ordinance prohibits Legend and Continental from offering scheduled commercial passenger service at Love Field, except within Texas and the four contiguous states.

(D4) The DFW Board and Fegan may not allow interstate passenger service from Love Field, unless such service is restricted to service to the four contiguous states or unless the DFW Board allows such service only after making a determination pursuant to section 9.5 of the Bond Ordinance that such service is necessary in the interest of public safety, in the interest of prudent and efficient operations at DFW, or in the interest of satisfying an overriding public need for decentralized Certificated Air Carrier Services in the Dallas–Fort Worth metropolitan area considered as a whole.

(D5) All taxable costs of court, excluding attorneys' fees, are taxed against the defendants.

In August 1998, the DOT had begun a proceeding at the request of Fort Worth, Dallas, Legend, and several members of Congress. On December 22, 1998, the DOT issued a declaratory order, holding that:

(i) Fort Worth may not enforce any commitment by Dallas under the Bond Ordinance or other agreement to limit operations at Love Field authorized by federal law, and Dallas's proprietary powers do not allow it to restrict services at Love Field authorized by federal law;

(ii) the ability of Dallas to limit the type of airline service operated at Love Field is preempted by the Wright and Shelby Amendments;

(iii) any airline operating aircraft with a passenger capacity of no more than fifty-six passengers and a gross aircraft weight of no more than 300,000 pounds may operate service with any type of equipment and flights of any length from or to Love Field, notwithstanding any claim that such service violates any agreement between Dallas and Fort Worth;

(iv) the DFW Board may not enforce any contract provision that allegedly bars an airline from operating interstate airline service at another airport in the Dallas–Fort Worth metropolitan area; and

(v) any airline may offer through service between Love Field and any other point to passengers using a flight between Love Field and another point within Texas operated under subsection (a) of the Wright Amendment, as amended by the Shelby Amendment.[8]

On January 6, 1999, Continental filed a motion for new trial or to modify the judgment asking the trial court to consider and follow the DOT's order, which Continental had attached to its motion. On January 15, 1999, Dallas requested that the trial court enter an order dismissing or abating the case in deference to the DOT's primary jurisdiction and the Fifth Circuit's exclusive jurisdiction to review the DOT's order or, alternatively, that the trial court modify its judgment to conform to the DOT's order. Also on January 15, 1999, Legend filed a motion for new trial or to modify the judgment based on the DOT's order.

In three orders signed on January 27, 1999, the trial court stated that it had considered the motions, the responses and other filings, and the DOT's order and denied the motions. Legend, Continental, and Dallas then appealed the trial court's December 16, 1998 judgment to this court. The Fifth Circuit Court of Appeals af-firmed the DOT's order on February 1, 2000.[9]

## DALLAS'S OBLIGATIONS UNDER THE AGREEMENT AND THE BOND ORDINANCE

This case presents significant issues that must be decided under state law. The primary issue before the trial court was whether Dallas is contractually obligated *under the Agreement and the Bond Ordinance* to prohibit interstate flights from Love Field to states other than Louisiana, Arkansas, Oklahoma, and New Mexico. Dallas and the other defendants have not challenged the validity of the Agreement and the Bond Ordinance. Rather, they contend that Dallas's ability to prohibit such flights is preempted by federal law. The trial court found that the Agreement and the Bond Ordinance are valid, enforceable, and not preempted by federal law. Thus, the trial court concluded that even in light of the DOT's order, Dallas is contractually obligated to prohibit scheduled interstate passenger service to or from Love Field to points beyond the four contiguous states.

Even assuming that the DOT's order and the Fifth Circuit's decision are correct, I believe that the trial court was correct in its holding that Dallas is obligated under the Agreement and the Bond Ordinance to prohibit such flights. Specifically, even if the DOT's order and the Fifth Circuit's decision prohibit Dallas from restricting routes at Love Field, they do not prohibit Dallas from closing Love Field to all Certificated Air Carrier Services, as originally contemplated by the Agreement and the Bond Ordinance.

Section 9.5(A) of the Bond Ordinance reflects the cities' original intent to phase out all Certificated Air Carrier Services at Love Field:

---

**8.** *See* Love Field Serv. Interp. Proc., DOT Decl. Order No. 98–12–27, 58 (1998).

**9.** *See American Airlines, Inc. v. Department of Transp.*, 202 F.3d 788, 813 (5 th Cir.2000), *petition for cert. filed,* 68 U.S.L.W. 3577 (U.S. Mar. 3, 2000) (No. 99–1462), 68 U.S.L.W. 3698 (U.S. May 1, 2000) (Nos.99–1739, 99–1745).

It is acknowledged and understood by the Cities that they, in Love Field, Redbird, GSIA and Meacham Field, own and operate airports which by their nature are potentially competitive with the operation of the Regional Airport. It is further acknowledged and recognized that the revenues to be derived from those airport facilities are not, under the terms of this Ordinance, pledged to the payment of the Bonds, except under the circumstances described in Section 6.3 hereof. Accordingly, the Cities, each with respect to its own individually owned airport facilities, as above named, hereby covenant and agree that from and after the effective date of this Ordinance, shall take such steps as may be necessary, appropriate, and legally permissible (without violating presently outstanding legal commitments or covenants prohibiting such action), *to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services,* and to transfer such activities to the Regional Airport effective upon the beginning of operations at the Regional Airport. [Emphasis added.]

The Bond Ordinance defines "Certificated Air Carrier Services" as aircraft operations of the following types when operating on a regular and continuing basis:

(1) interstate services conducted by commercial air carriers according to published flight schedules and holding certificates of public convenience and necessity or similar evidences of authority issued by the CAB or any successor agency;

(2) services conducted by foreign air carriers according to published flight schedules holding permits or similar evidences of authority issued by the CAB or any successor agency or by any other agency or department of the United States; and

(3) intrastate services conducted by commercial air carriers according to published flight schedules and holding certificates of public convenience and necessity or similar evidences of authority issued by the Texas Aeronautics Commission or any successor agency.

Section 9.5(A) of the Bond Ordinance further states:

From time to time hereafter, the Board may review the effect and application of such covenant, and, by concurring action of not less than eight (8) of its members, the Board may reasonably limit its scope and effect and may waive its application in specific instances if it shall first determine that such action is necessary (1) in the interest of the public safety; (2) in the interest of prudent and efficient operations at the Regional Airport; or (3) in the interest of satisfying an overriding public need for decentralized Certificated Air Carrier Services in the Dallas–Fort Worth metropolitan region considered as a whole.

The record does not reflect that the DFW Board has made any finding that interstate service from Love Field to states beyond the four contiguous states is necessary in the interest of public safety, the interest of prudent and efficient operations at DFW, or the interest of satisfying an overriding public need for decentralized Certificated Air Carrier Services. If the DFW Board makes such a finding, it can waive the Bond Ordinance's application to interstate flights from Love Field to points beyond the four contiguous states.

In summary, I would hold that, notwithstanding the DOT's order and the Fifth Circuit's decision, if Dallas does not prohibit flights from Love Field to points beyond the four contiguous states, it will breach the Agreement and the Bond Ordinance. I would further hold that Dallas can comply with its contractual obligations under the Agreement and the Bond Ordinance by either (1) pursuant to section 9.5(A) of the Bond Ordinance, requesting that the DFW Board waive the application of the Bond Ordinance to interstate flights from Love Field to points beyond the four

contiguous states, *after* finding that such flights are necessary in the interest of public safety, of prudent and efficient operations at DFW, or of satisfying an overriding public need for decentralized Certificated Air Carrier Services; or (2) as the owner of Love Field, closing Love Field to all Certificated Air Carrier Services. For these reasons, I disagree with the majority's holding that federal law relieves Dallas from its obligation under the Agreement and the Bond Ordinance to prohibit interstate flights from Love Field to points beyond the four contiguous states.

## DUE PROCESS CONSIDERATIONS

I further dissent because I believe that this case presents serious due process considerations that have not been addressed by the majority opinion. In this case, Dallas and Fort Worth entered into the Agreement and the Bond Ordinance before Congress passed the ADA. Therefore, applying the ADA to the Agreement and the Bond Ordinance results in retroactive application of a statute, thus creating potential due process ramifications.

The United States Supreme Court has held that retroactive legislation has to meet a burden not faced by legislation that has only future effects.[10] "It does not follow ... that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former."[11] To survive a due process challenge, it must be shown that the retroactive application of the legislation is itself justified by a rational legislative purpose.[12] While there may be a rational legislative purpose that justifies the retroactive application of the ADA to the

Agreement and the Bond Ordinance, it has yet to be established.

In my opinion, retroactive application of the ADA to the Agreement and the Bond Ordinance presents two due process concerns. First, at the mandate of the CAB, Fort Worth entered into the Agreement and the Bond Ordinance. Then, in detrimental reliance on the Agreement and the Bond Ordinance and on the expected revenues from DFW, Fort Worth demolished GSIA and required all Certificated Air Carrier Services to move to DFW. There is summary judgment evidence that increased flights at Love Field will result in a decrease in revenue at DFW. Loss of revenue at DFW will result in less revenue for Fort Worth.

Second, as Appellees point out, the cities have sold approximately two billion dollars in DFW revenue bonds pursuant to the Bond Ordinance. Approximately one billion dollars in DFW revenue bonds remain outstanding. The potential effect of excluding Southwest from Love Field on holders of Love Field revenue bonds was one of the reasons stated by the United States District Court for the Northern District of Texas for its 1973 holding that Dallas was prohibited from excluding Southwest from Love Field:

> The exclusion of Southwest Airlines from Love Field would breach each of these covenants [with bondholders to maintain operations at Love Field]. The fact that circumstances may have changed and that Dallas would now like to ignore its prior covenants does not provide an adequate basis for the City's proposed action. Such obligations are binding and the City must adhere to them.[13]

The purpose of section 9.5(A) of the Bond Ordinance is to ensure adequate rev-

10. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984).

11. *Id.* (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976)).

12. *See id.*

13. *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1034 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974).

enues from operations at DFW to cover the operating expenses of DFW and to repay the DFW revenue bonds. Section 9.5(A) requires the cities to compensate DFW for loss of revenues caused by Certificated Air Carrier Services at the cities' other airports, if such services would result in the DFW revenues dropping below the amount needed to cover the operating expenses and to repay the bonds:

And in no event, by agreement with air carriers or otherwise, shall limitations or waivers of such covenant allowing a commencement or resumption of Certificated Air Carrier Services at any other airport or airports be adopted if the result thereof would be the reduction in Pledged Revenues below the amount required to satisfy the provisions of Section 9.4 hereof, unless the City (or the Cities in the case of more than one airport) shall also pledge to the payment of all Bonds, by appropriate official action, such part of the revenues from the airport or airports to which such services are to be transferred, resumed or originally commenced, as will justly compensate the Regional Airport (at rates then in effect thereat for similar services), for the loss of such services and the gross Revenues therefrom.

Because the Bond Ordinance provides that Dallas and Fort Worth are to repay the bonds out of the revenues earned by DFW, a loss of revenue at DFW due to increased interstate flights at Love Field affects the ability of Dallas and Fort Worth to repay the bonds. The bondholders are not parties to this suit; consequently, there has been no determination as to what remedies they may have. In summary, I also dissent to the majority's opinion because it does not address the due process ramifications that retroactive application of the ADA will have on Fort Worth and on the ability of Dallas and Fort Worth to repay the DFW revenue bonds.

## COMMUTER AIRLINES EXCEPTION

In my opinion, the trial court was asked to determine whether Dallas was obligated *under the Agreement and the Bond Ordinance* to prohibit flights from Love Field to points beyond the four contiguous states. In reference to the Shelby Amendment, the trial court found only that "[t]he ADA, 'Wright' or 'Shelby' Amendments do not convey affirmative rights which allow interstate passenger service from Love Field to points beyond Texas and its four contiguous states." Because the trial court implicitly found that the Shelby Amendment did not preempt Dallas's obligations under the Agreement and the Bond Ordinance, the trial court did not specifically address the issue of whether the Shelby Amendment authorizes flights of any length from Love Field on aircraft reconfigured to seat less than fifty-six passengers. Because I agree with the trial court that Dallas is contractually obligated to prohibit interstate passenger service from Love Field to points beyond Texas and its four contiguous states, and because Dallas is fully capable of performing its contractual obligations as discussed above (notwithstanding the Shelby Amendment), I do not believe that it is necessary for this court to address the commuter airlines exception of the Shelby Amendment in this appeal.

## CONCLUSION

Because I disagree with the majority's holding that federal law relieves Dallas from its obligation under the Agreement and the Bond Ordinance to prohibit interstate flights from Love Field to points beyond the four contiguous states and the majority's addressing the commuter airlines exception of the Shelby Amendment, and because I believe that the due process ramifications of retroactive application of the ADA have not been adequately addressed, I respectfully dissent to the majority's scholarly and well-reasoned opinion.